819 A.2d 1030

**In re YVE S.**

**Nos. 24, 50, Sept. Term, 2002.**

Court of Appeals of Maryland.

March 27, 2003.

554

Peter F. Rose, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for appellant.

Nancy C. Hopkins, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for appellee.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

HARRELL, Judge.

## I.

These combined cases arose initially from a determination by the District Court of Maryland, sitting in Montgomery County as the Juvenile Court,[1] to change the permanency plan for a twelve year-old child, Yve S., from the goal of reunification with her biological mother, Yvonne S., to one of long-term foster care. The Montgomery County Department of Health and Human Services (the "Department") initiated the proceedings on 26 February 1997 by filing a petition with the District Court alleging that Yve S. was a Child in Need of Assistance ("CINA").[2] On 10 June 1997, following three days of hearings, the juvenile court found Yve S. to be a CINA and committed her to the Department for foster care. After 13 months, on 31 July 1998, Yve S. was returned, temporarily as it turned out, to her mother, Yvonne S., under an Order for Protective Supervision. Eleven days later, on 11 August 1998, the juvenile court held an emergency hearing and, again, placed Yve S. in the Department's custody and returned her to foster care.

---

1. Late in the course of these proceedings, the jurisdiction for actions involving juveniles in Montgomery County was moved from the District Court to the Circuit Court for Montgomery County. See Chapter 414, Laws 2001 (effective 1 March 2002).

2. See Maryland Code (1974, 2002 Repl.Vol.), Courts & Judicial Proceedings Article, Subtitle 8, Juvenile Causes—Children in Need of Assistance.

A little over 7 months later, in March of 1999, the juvenile court convened a permanency planning hearing for Yve S. At the end of four non-consecutive days of hearings, the court ordered, on 20 September 1999, that the goal of the permanency plan for Yve S. should be termination of parental rights ("TPR") and adoption.

On 20 March 2000, the court convened a permanency planning review that would spread over more than a year. By the time of a hearing on 20 October 2000, the Department advocated changing the permanency plan goal from TPR/adoption to reunification with the mother; however, the court declined to change the goal of the plan. The court held additional review hearings on 13 and 20 December 2000, 15 and 16 February 2001, and 28 March 2001. On 28 March 2001, at the conclusion of the last day of the hearing process that had begun the previous March, the court changed the permanency plan from TPR/adoption to long-term foster care. Yvonne S. noted a timely appeal to the Court of Special Appeals.

On 8 November 2001, while Yvonne S.'s first appeal was pending in the Court of Special Appeals, the juvenile court convened another review hearing.[3] The juvenile court concluded that hearing on 20 December 2001, at which time it issued an order reaffirming the content of its 28 March 2001 order. Yvonne S. noted a second appeal.

On 23 January 2002, the Court of Special Appeals filed an unreported opinion in the first appeal affirming the juvenile court's 28 March 2001 order, which had changed Yve S.'s permanency plan to long-term foster care. Yvonne S. filed a petition for writ of certiorari asking this Court to review that decision. Thereafter, Yvonne S. petitioned this Court to issue

---

**3.** The actual purpose of this hearing was made somewhat unclear by the juvenile judge's comment on the record. She stated that it was not a "review hearing," but rather was to receive information and psychological evaluations of the child which had been ordered at the conclusion of the prior permanency hearing. Nevertheless, this hearing resulted in the judge issuing a reaffirmation of the 28 March 2001 permanency plan determination, which suggests that this was indeed a review hearing under the applicable statute, as explained *infra*.

a writ of certiorari to the Court of Special Appeals before it could decide her second appeal regarding the 20 December 2001 order of the juvenile court. On 8 May 2002, this Court granted both petitions and consolidated the cases. *In Re: Yve. S.*, 369 Md. 178, 798 A.2d 551 (2002).

Subsequently, on 20 April 2002 and 16 July 2002, the juvenile court—now the Circuit Court for Montgomery County (see n. 1 *supra*), but with the same judge sitting by special designation during calendar 2002—held another review hearing in Yve S.'s case and entered a new order establishing permanent foster care as the goal of the permanency plan. Yvonne S. noted a third appeal to the Court of Special Appeals and shortly thereafter filed with regard to that appeal a petition for writ of certiorari with this Court. On 22 August 2002, we granted that petition, *In re Yve S.*, 370 Md. 268, 805 A.2d 265 (2002), and transferred the appeal to our regular docket. Because the third appeal raised issues concerning the jurisdiction of the juvenile court to act while an appeal of its earlier order on the same subject matter was pending, it was not consolidated with the earlier cases, but was briefed separately. All of the cases, however, were argued on the same day. We shall decide all issues raised with this single opinion.

## II.

### Issues

Petitioner, Yvonne S., presents the following questions for our consideration, which we rephrase as follows:

1. Does the fact that a parent has a mental illness that is being successfully managed nevertheless provide a "compelling reason" to deny reunification and instead adopt a permanency plan of long-term foster care?

2. Is it proper to allow a social worker to give her opinion as to the demeanor of the parent when the parent testified, and to give her opinion of the substance of the parent's testimony?

3. Did the trial court err in refusing to recuse itself from further participation in this case?

4. Whether the trial court erred in changing the permanency plan from long-term foster care to permanent foster care during the pendency of the appeal on the former determination?

### III.

Yve S. entered into the Montgomery County foster care system in February of 1997, at the age of six, after the Department received reports that she was not being fed adequately and that she and her mother, Yvonne S., were homeless. Prior to this, Yvonne S. and Yve S. led a nomadic lifestyle. In 1990, they lived in Key West, Florida, where Yve S. was born. In 1991, they lived in Maryland; in 1992, they lived in Martinsburg, West Virginia. In 1993, they lived in Millville, West Virginia, where Yve S. was first taken into foster care. In 1994, they moved to Gaithersburg, Maryland, and then to Westminister, Maryland, in 1995. In 1996, they moved to North Carolina. Finally, in 1997, they returned to Montgomery County.

Soon after Yve S. was placed in foster care in Montgomery County, the Department learned that Yvonne S. had been diagnosed with bipolar disorder and schizo-affective disorder, dating back to her teens. A psychiatric evaluation of Yve S. resulted in a diagnosis of "acute stress reaction," chronic post-traumatic stress disorder, and dissociative disorder. Yve S. also displayed symptoms of possible physical and sexual abuse and, in July of 1997, alleged that she had been molested by a boyfriend of Yvonne S.

Yvonne S. complied with the Department's recommendations for mental health treatment and parenting classes. As a result, she and Yve S. were reunited in June of 1998. In July 1998, the juvenile court approved Yvonne S.'s request to move to the Outer Banks of North Carolina, where she had leased a mobile home. Montgomery County, however, never initiated a home study nor completed a proper interstate compact for the

Dare County, North Carolina, family welfare authorities to implement. After only a few days in North Carolina, the Dare County Department of Social Services found it necessary to remove Yve S. from Yvonne S.'s care. Yvonne S. had been evicted from the trailer, and allegedly had left Yve S. in the care of a "known sex offender," though there is no record that this person's status as such was known to Yvonne S. The Dare County Department placed Yve S. in emergency shelter care and then returned her to Montgomery County, where she was placed with a foster care family.

Yvonne S. remained in North Carolina for a time following Yve S.'s return to foster care in Maryland. During that time, in August 1998, she entered into a service agreement with the Montgomery County Department in which she agreed to obtain treatment for her mental illness and maintain stable housing and employment. Yvonne S.'s tenure in North Carolina concluded with a psychiatric hospitalization, after she stopped taking her medications. When she was discharged in late February 1999, she was given a two-week supply of her medications and a one-way bus ticket to Montgomery County.

In March, 1999, Yvonne S. began receiving mental health treatment at St. Luke's Hospital in Montgomery County, under the care of Dr. James Harold, a psychiatrist, and also began having visitation with Yve S. on a regular basis With further assistance from the therapists and social workers at St. Luke's, as well as guidance and support from her church community, Yvonne S. stabilized, became employed, and established a home. In June 1999, she obtained a job at a local nursing home as a housekeeper. By the end of August 1999, Yvonne S. had advanced to the position of activities coordinator and had obtained her own apartment.

By the summer of 2000, Yvonne S. had maintained the same job and apartment for more than a year. She consistently attended her treatment at St. Luke's. By the end of that summer, Yvonne S. was having weekend-long visits with Yve S., and, in light of Yvonne S.'s apparent stability, the Department advocated that the permanency plan for Yve S., which

previously had been "TPR/adoption," be changed to "reunification" with her mother.

In a letter to the juvenile court, dated 26 September 2000, the foster parents made a plea for the court to reject the Department's recommendation for reunification, arguing that Yvonne S., with her mental illness, could not raise a child with Yve S.'s needs. At a review hearing held on 20 October 2000, the court distributed copies of this letter to the parties, and shortly thereafter, the Department changed its position from reunifying Yve S. with her mother to one of placing Yve S. in long term foster care with the foster parents.

On 20 December 2000, 15 and 16 February 2001, and 28 March 2001, the juvenile court conducted the permanency planning hearing required by statute.[4] Only a few days before her testimony in this important hearing, Yvonne S. lost her job at the nursing home. Despite the fact that she also was working part-time as a pet sitter, doing housecleaning for hire, and volunteering at a woman's homeless shelter at the time of the hearing, she was understandably nervous during her testimony. On the Sunday prior to the 28 March 2001 hearing, Yvonne S. and Yve S. drove from Yvonne S.'s home in Gaithersburg to Bethesda to tour the grounds of the Bethesda Naval Hospital, so that Yve S. could see a particular statue deemed pertinent to her heritage. They then traveled to Rockville for a 10:00 a.m. church service, which they attended with a woman whom Yvonne S. had met while working at the homeless shelter during the preceding week. This level of activity was viewed as extraordinary by the Department's assigned social worker, Ms. Carolyn Rose. Ms. Rose testified, over objection, to that effect, and that, in her view, that level of activity, combined with Yvonne S.'s nervousness on the witness stand, indicated to her the imminent onset of a manic episode on the part of Yvonne S. Despite testimony by the treating psychiatrist, Dr. Harold, that a manic episode was not imminent, Ms. Rose, immediately following the 16 February

---

4. Maryland Code (1974, 2002 Repl.Vol.), Cts. & Jud. Proc. Art., § 3–823(b).

2001 hearing, reduced the visitation from weekend-long visits to one hour of supervised visitation, later increased to a few hours once a week.

On 28 March 2001, the juvenile judge ordered that the permanency plan pursue long term foster care as its goal. The hearing judge affirmed her permanency plan determination at the conclusion of another review hearing on 20 December 2001, despite testimony that Ms. Rose's forecast of a manic episode had failed to materialize, Yvonne S. was employed making a higher income than before, and all visitation had gone well. Similarly, the Department, through Ms. Rose, continued to refuse to return visitation to its prior frequency and duration. The plan goal became permanent foster care by virtue of the court's 16 July 2002 order. Additional facts will be supplied as appropriate to our discussion of each issue.

## IV.

From time to time we confront cases which present issues which merit even more extensive discussion of the legal principles involved than flows from our normal close attention of each case. Sometimes this is because of the highly technical or complex nature of the case. Other times it is because of the fundamental nature of the rights and responsibilities of the parties involved. The present case is situated on the frontier of what State action may be permissible in the face of fundamental rights possessed by its citizens,[5] and involves

---

**5.** As recently noted in *Shurupoff v. Vockroth*, 372 Md. 639, 814 A.2d 543 (2003), it is meaningful in the proper analysis of cases where parental rights collide with the best interest of the child standard what the context is in which the conflict arises. *Id.* at 656–59, 814 A.2d at 554–55. For example, on one hand the Court's due process analysis, under *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), in a termination of parental rights (TRP) case, differs from that in a parent versus third party custody case. *Id.* The distinction in analysis is premised on the former involving "a singular private interest [the parent's right to raise his or her child] being attacked by the State, in its capacity as *parens patriae*" (*Shurupoff*, 372 Md. at 657, 814 A.2d at 554), while the latter involves two private interests in a modifiable custody situation. *Id.* at 256–57, 814 A.2d at 554. In the present case, the juvenile court orders in question call for long term and, later,

standards which, while their names suggest intuitive defini-
tions and means of application, are in fact highly technical and
complex in nature, and contain well established elements
which are not as self-evident in application as their titles
suggest.

The fundamental doctrinal problem presented by this case is
the proper definition and application of the "best interest of
the child" standard. The problem arises in large part because
the name of the standard itself invites an "intuitive" under-
standing which, upon examination, bears little resemblance to
how the standard has been defined by our cases. The stan-
dard does not require simply that a determination be made
that one environment or set of circumstances is superior to
another. If that were the case, child custody matters would
involve relatively simple choices. Although much of what we
include in this opinion is derivative, there is value in massing it
in this appropriate case.

### A.

### THE FUNDAMENTAL RIGHTS OF A PARENT

The proper starting point for legal analysis when the
State involves itself in family relations is the fundamental
constitutional rights of a parent. Certain fundamental rights
are protected under the U.S. Constitution, and among those
rights are a parent's Fourteenth Amendment[6] liberty interest
in raising his or her children as he or she sees fit, without
undue interference by the State. The rights and protections
afforded a parent, as recognized by the United States Su-
preme Court, were gathered recently in the well researched

---

permanent foster care, coupled with an administrative decision by the
Department to limit severely visitation by the mother. The present
situation, for analytical purposes, falls between the two paradigms
considered in *Shurupoff*, but closer to a TPR situation.

**6.** *See In re Adoption/Guardianship Nos. J9610436 and J9711031*, 368
Md. 666, 671–73, 796 A.2d 778, 781–82 (2002); *In re Adoption/Guard-
ianship No. TPR970011*, 122 Md.App. 462, 473–74, 712 A.2d 597, 602
(1998).

opinion of *Wolinski v. Brouneller*, 115 Md.App. 285, 693 A.2d 30 (1997), from which we shall quote at length.

Beginning with *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) and *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), the Supreme Court, in a variety of contexts, has recognized that freedom of personal choice in matters of marriage, family life, and the upbringing of children is a liberty interest protected by the Fourteenth Amendment. *See M.L.B v. S.L.J.*, U.S. LEXIS, [519 U.S. 102] 117 S.Ct. 555, 136 L.Ed.2d 473 (Dec. 16, 1996) (termination of parental rights); *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (same); *Parham v. J.R.*, 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) (right to care for mental health of child); *Moore v. City of East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (right of extended family to live together); *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (right to direct children's education, coupled with right to freedom of religion); *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (right to raise children); *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (right to allow child to work); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (right to direct upbringing and education of children); *Meyer*, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (announcing the liberty interest "to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home, and bring up children").

Within the narrower context of the parent-child relationship, the Supreme Court has deemed the right to rear a child "essential," *id.*, and encompassed within a parent's "basic civil rights." *Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). Maryland has consistently echoed the Supreme Court, declaring a parent's liberty interest in raising a child a fundamental one that cannot be taken away unless clearly justified. *In re Adoption/Guardianship No. 10941*, 335 Md. 99, 112, 642 A.2d 201

(1994); *In re Adoption/Guardianship Nos. CAA92–10852 & CAA92–10853,* 103 Md.App. 1, 12, 651 A.2d 891 (1994) ("This right is in the nature of a liberty interest that has long been recognized and protected under the state and federal constitutions."). In *In re Adoption/Guardianship No. 10941,* the Court of Appeals quoted with approval from Justice Blackmun's dissent in *Lassiter v. Department of Social Servs.,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981):

> At stake here is "the interest of a parent in the companionship, care, custody, and management of his or her children." This interest occupies a unique place in our legal culture, given the centrality of family life as the focus for personal meaning and responsibility. "[Far] more precious ... than property rights," parental rights have been deemed to be among those "essential to the orderly pursuit of happiness by free men ...".

*Id.* at 38[, 101 S.Ct. 2153] (citations omitted), *quoted in In re Adoption/Guardianship No. 10941,* 335 Md. at 113[, 642 A.2d 201]. *See also In re Adoption/Guardianship No. 93321055/CAD,* 344 Md. 458, 491, 687 A.2d 681 (1997); *In re: Matthew R.,* 113 Md.App. 701, 721, 688 A.2d 955 (1997); *Coffey v. Dep't of Social Servs.,* 41 Md.App. 340, 357, 397 A.2d 233 (1979).

115 Md.App. at 298–99, 693 A.2d at 36 (some internal citations omitted). We recently reiterated the importance of these constitutional protections of parental interests in *In re Adoption/Guardianship Nos. J9610436 and J9711031,* 368 Md. 666, 796 A.2d 778 (2002), where we pointed out that:

> Most recently, in *In re Mark M.,* 365 Md. 687, 705, 782 A.2d 332, 342–43 (2001), this Court reiterated the notion of parenting as a fundamental right:
>
>> "A parent's interest in raising a child is, no doubt, a fundamental right, recognized by the United States Supreme Court and this Court. The United States Supreme Court has long avowed the basic civil right encompassed by child rearing and family life. *See Troxel v. Granville,* 530 U.S. 57, 66, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49, 57

(2000)(stating that 'the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children'); *See also Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599, 606 (1982) (discussing 'the fundamental liberty interest of natural parents in the care, custody, and management of their child'); *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551, 558–59 (1972) (stating that 'the rights to conceive and to raise one's children have been deemed "essential," ' and that 'the integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment ... the Equal Protection Clause of the Fourteenth Amendment ... and the Ninth Amendment ..." (internal citations omitted)). Maryland, too, has declared a parent's interest in raising a child to be so fundamental that it 'cannot be taken away unless clearly justified.' *Boswell v. Boswell,* 352 Md. 204, 218, 721 A.2d 662, 669 (1998) (citing *In re Adoption[/Guardianship] No. 10941,* 335 Md. 99, 112, 642 A.2d 201 (1994))."

368 Md. at 671, 796 A.2d at 780–81; *see also Shurupoff v. Vockroth,* 372 Md. 639, 649–50, 814 A.2d 543, 550 (2003).[7]

## B.

## THE BEST INTEREST OF THE CHILD

■ The rights of a parent in the raising of his or her children, however, are not absolute. One need not wander far into the thickets of family law before running into situations and circumstances where application of an absolute right of the parent would fail to produce a just result. Divorce is perhaps the most obvious situation. Where two parents have equal constitutional rights as parents, and both are exercising those rights to opposing ends, what is to become of the child or children involved? What are the child's rights in such a

---

7. For a discussion of the history of parental rights at common law, *see Montgomery County Department of Social Services v. Sanders,* 38 Md. App., 406, 414–21, 381 A.2d 1154, 1160–63 (1977).

situation, and by what standard is a court to avail itself in order both to uphold the rights of the parents while reaching an outcome society finds acceptable for the blameless offspring? Further, in a variety of situations, such as the one *sub judice*, a court must ask to what extent the State has an interest in the child as *parens patriae*—a corollary of the State's interest in protecting the health, safety, and welfare of its citizenry. Again, quoting extensively from *Wolinski:*

The Supreme Court has emphasized, however, that "rights of parenthood are [not] beyond limitation," and that the "state has a wide range of power for limiting parental freedom and authority in things affecting a child's welfare....". Thus, a parent's right to direct his or her child's upbringing is not absolute. Rather, Due Process analysis requires the delicate balancing of all of the competing interests involved in the litigation. In the context of most family law disputes over children, the State's interest is to protect the child's best interests as *parens patriae*—a derivation of the State's interest in protecting the health, safety, and welfare of its citizenry.

The importance of those State interests that successfully override parental autonomy in raising children is determined by the nature of the individual liberty interests upon which the State laws or regulations impinge. A regulation or law significantly curtailing a fundamental right must undergo strict scrutiny—it must be narrowly tailored to serve a compelling public interest. Restrictions upon rights not deemed fundamental need only be rationally related to some purpose within the competency of the State. Finally, there are those restrictions upon rights deemed "substantial," though not fundamental, that must undergo intermediate-level scrutiny—governmental interference is sanctioned only when the interference is supported by a substantial governmental interest.

As noted above, the State's interest in all custody, adoption, and visitation disputes is to protect the best interests of the child caught in the middle of the fight. The Court of Appeals has often reaffirmed that this interest takes precedence over the fundamental right of a parent to raise his or

her child. The courts have said time and again that the best interest standard is dispositive in custody awards. In the context of adoption cases, the Court of Appeals has labeled "compelling" the State's interest in securing permanent homes for children placed into its custody because of an inability or unwillingness of their parents to care for them properly.

115 Md.App. at 300–02, 693 A.2d at 37–38 (internal citations omitted).

In the case of *In re Mark M.*, 365 Md. 687, 782 A.2d 332 (2001), this Court recently reiterated these considerations:

That fundamental interest [in rasing a child], however, is not absolute and does not exclude other important considerations. Pursuant to the doctrine of *parens patriae*, the State of Maryland has an interest in caring for those, such as minors, who cannot care for themselves. We have held that "the best interests of the child may take precedence over the parent's liberty interest in the course of a custody, visitation, or adoption dispute." That which will best promote the child's welfare becomes particularly consequential where the interests of a child are in jeopardy, as is often the case in situations involving sexual, physical, or emotional abuse by a parent. As we stated in *In re Adoption/Guardianship No. A91–71A,* 334 Md. 538, 640 A.2d 1085 (1994), the child's welfare is "a consideration that is of 'transcendent importance' " when the child might otherwise be in jeopardy. *Id.* at 561, 640 A.2d at 1096 (citation omitted). Therefore, visitation may be restricted or even denied when the child's health or welfare is threatened.

We have recognized that in cases where abuse or neglect is evidenced, particularly in a CINA case, the court's role is necessarily more pro-active. In fact, whereas the standard for denying parental visitation is generally quite strict—i.e. "it would only be in an exceptional case and under extraordinary circumstances that the right of visitation will be denied" (*see Boswell v. Boswell,* 352 Md. at 220, 721 A.2d at 670 (1998))(stating that "visitation rights ... are not to be denied even to an errant parent unless the best interest of

the child would be endangered by such contact")(quoting *Roberts v. Roberts*, 35 Md.App. 497, 507, 371 A.2d 689, 694 (1977))—in cases where evidence of abuse exists, courts are required by statute to *deny* custody or unsupervised visitation *unless* the court makes a specific finding that there is no likelihood of further child abuse or neglect. *See* Maryland Code, § 9–101 of the Family Law Article (1984, 1999 Repl.Vol.).[8] Thus, courts have a higher degree of responsibility where abuse is proven.

365 Md at 705–06, 782 A.2d at 342–43(emphasis in original)(some internal citations omitted).

The best interests of the child standard embraces a strong presumption that the child's best interests are served by maintaining parental rights. See *In Re: Adoption/Guardianship Nos. J9610436 & J9711031*, 368 Md. 666, 692–93, 796 A.2d 778, 793 (2002). If it were otherwise, the most disadvantaged of our adult citizens always would be at greater risk of losing custody of their children than those more fortunate. *Id.* 368 Md. at 673–74, 699–700, 796 A.2d at 782–83, 797–98. Those of our citizens coping with emotional or mental difficulties could be faced with such discrimination. As the Court of Special Appeals pointed out in *In re: Barry E.*, 107 Md.App. 206, 667 A.2d 931 (1995), the emotional or mental difficulties experienced by a parent are not sufficient reason for removing a child except in more extreme cases: [9]

---

**8.** Md.Code (1974, 1999 Repl.Vol.), Family Law Article, § 9–101 states:
(a) *Determination by court.*—In any custody or visitation proceeding, if the court has reasonable grounds to believe that a child has been abused or neglected by a party to the proceeding, the court shall determine whether abuse or neglect is likely to occur if custody or visitation rights are granted to the party.
(b) *Specific finding required.*—Unless the court specifically finds that there is no likelihood of further child abuse or neglect by the party, the court shall deny custody or visitation rights to that party, except that the court may approve a supervised visitation arrangement that assures the safety and the physiological, psychological, and emotional well-being of the child.

**9.** See also *In re Adoption/Guardianship Nos. J9610436 and J9711031*, 368 Md. at 704–07, 796 A.2d at 800–02 (dissenting opinion).

> The fact that appellant has a mental or emotional problem and is less than a perfect parent or that the children may be happier with their foster parents is not a legitimate reason to remove them from a natural parent competent to care for them in favor of a stranger.

107 Md.App. at 220, 667 A.2d at 938.

■ The Supreme Court placed its imprimatur on the presumption that parents act in the best interests of their children in *Parham v. J.R.,* 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979), noting that in most cases, "the child's interest is inextricably linked with the parents' interest in and obligation for the welfare and health of the child. . . ." *Id.* 442 U.S. at 600, 99 S.Ct. 2493. Explaining the basis for this conclusion, the Court stated:

> The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More importantly, historically, it has recognized that natural bonds of affection lead parents to act in the best interests of their children.

*Id.* 442 U.S. at 602, 99 S.Ct. 2493.

■ This presumption also is a well established principle of Maryland law. As the Court of Special Appeals pointed out in *Wolinski:*

> Maryland has adopted, in termination of parental rights, adoption, and custody proceedings, a *prima facie* presumption that a child's welfare will be best served in the care and custody of its parents rather than in the custody of others. That presumption is overcome if opposing parties show that the natural parent is unfit to have custody, or exceptional circumstances make parental custody detrimental to the best interests of the child.

*Wolinski,* 115 Md.App. at 311, 693 A.2d at 42–43 (internal citations omitted). In whatever context the best interest of the child is the applicable standard, the presumption exists, until rebutted, that it is in the child's best interest to be placed with a parent.

## C.

## THE RELATIONSHIP OF THE STATUTES AND THE COMMON LAW STANDARDS

### 1.

### THE STATUES

■ The fundamental right of parents to raise their offspring is not only well established in our common law traditions, but also in the relevant enactments of the federal and Maryland legislatures. Due to the prominent role of these statutes in the case *sub judice*, we shall include at length here the seminal dissertation on them found in *In re: Adoption/Guardianship No. 10941*, 335 Md. 99, 642 A.2d 201(1994), in which Judge Karwacki, writing for the Court, comprehensively addressed the state and federal statutory schemes. Judge Karwacki stated:

The Maryland General Assembly has enacted a comprehensive statutory scheme to address those situations where a child is at risk because of his or her parents' inability or unwillingness to care for him or her. Title 5 of the Family Law Article of the Maryland Code (1984, 1991 Repl.Vol.) (hereinafter "F.L.") governs the custody, guardianship, adoption and general protection of children who because of abuse or neglect come within the purview of the Department of Human Resources. This case involves the interplay between the child welfare statutes, F.L. § 5–501 *et seq.*, under juvenile jurisdiction, and the adoption statutes, F.L. § 5–301 *et seq.*, under equity jurisdiction.

Subtitle 7 of Title 5 of the Family Law Article concerns the protection of children who have been abused or neglected by their biological parents. Pursuant to this subtitle, certain authority figures, such as health practitioners, police officers, educators and human service workers, are required to report cases of suspected abuse or neglect. F.L. § 5–704. The local department of social services is then required to investigate such reports. F.L. § 5–706. Thereafter, in accordance with its findings and treatment plan, the local department is required to render appropriate services

in the best interests of the child,[2] including, when indicated, petitioning the juvenile court to commit the child to its care and custody. F.L. § 5–710(a). If the juvenile court determines that the child is a child in need of assistance (CINA),[3] it has discretion to order that the child be committed to the local department "on terms that the court considers appropriate . . . including designation of the type of facility where the child is to be accommodated, until custody . . . is terminated with approval of the court" or the child turns 21 years old. Md.Code (1974, 1989 Repl.Vol.) § § 3–820(c)(1)(ii) and 3–825 of the Courts & Judicial Proceedings Article. Such out-of-home placement can include placement in a licensed foster home, F.L. § 5–525, or placement with relatives.

[2] The local department should first assist in preventing the necessity of removing the child from the child's natural parent or guardian. If removal does become necessary, the department should then attempt to reunite the child with the child's natural parent or guardian. Where efforts at reunification fail, however, the Legislature has provided a comprehensive statutory scheme to enable the child to find a permanent home with another family.

[3] Md.Code (1974, 1989 Repl.Vol., 1993 Supp.), § 3–801 of the Courts and Judicial Proceedings Article defines "child in need of assistance" thusly:

(e) *Child in need of assistance.*—'Child in need of assistance' is a child who requires the assistance of the court because:

(1) He is mentally handicapped or is not receiving ordinary and proper care and attention, and

(2) His parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and his problems provided, however, a child shall not be deemed to be in need of assistance for the sole reason he is being furnished nonmedical remedial care and treatment recognized by State law.

During the 1970's, nationwide concern grew regarding the large number of children who remained out of the homes of their biological parents throughout their childhood, frequently moved from one foster care situation to another, thereby reaching majority without belonging to a permanent family. This phenomenon became known as "foster care drift" and resulted in the enactment by Congress of Public Law 96–272, the "Adoption Assistance and Child Welfare Act of 1980," codified at 42 U.S.C. § § 670–679 (1988). One of the important purposes of this law was to eliminate foster care drift by requiring states to adopt

statutes to facilitate permanent placement for children as a condition to receiving federal funding for their foster care and adoption assistance programs.

Under the federal act, a state is required, among other things, to provide a written case plan for each child for whom the state claims federal foster care maintenance payments. 42 U.S.C. § 671(a)(16). The case plan must include a description of the home or institution into which the child is placed, a discussion of the appropriateness of the placement, and a description of the services provided to the parents, child and foster parents to facilitate return of the child to his or her own home or to establish another permanent placement for the child. 42 U.S.C. § 675(1). The state must also implement a case review system that provides for administrative review of the case plan at least every six months and judicial review no later than eighteen months after placement and periodically thereafter. 42 U.S.C. § 675(5)(B) and (C). The purpose of the judicial review is to "determine the future status of the child" including whether the child should be returned to its biological parents, continued in foster care for a specified period, placed for adoption, or because of the child's special needs or circumstances, continued in foster care on a long term basis. 42 U.S.C. § 675(5)(C).

Maryland receives considerable federal funds pursuant to this Act. Accordingly, the Maryland General Assembly has enacted legislation to comply with the federal requirements. Under Maryland's statutory scheme, for those children committed to a local department of social services the department is required to develop and implement a permanency plan that is in the best interests of the child. F.L. § 5–525.

In developing the permanency plan, the department is required to consider a statutory hierarchy of placement options in descending order of priority. F.L. § 5–525(c). First and foremost, the department must consider returning the child to the child's natural parents or guardians. F.L. § 5–525(c)(1). If reunification with the biological parents is not possible, the department must consider placing the child with relatives to whom adoption, guardianship, or care and

custody, in descending order of priority, are planned to be granted. F.L. § 5–525(c)(2). If placement with relatives is not possible, then the department must consider adoption by a current foster parent or other approved adoptive family. F.L. § 5–525(c)(3). Only in exceptional situations as defined by rule or regulation is a child to be placed in long term foster care. F.L. § 5–525(c)(5).

If it is determined that reunification is not possible and that adoption is in the child's best interests, the juvenile court lacks jurisdiction to finalize this plan. *In re Darius A.,* 47 Md.App. 232, 235, 422 A.2d 71, 72 (1980); *see also* F.L. § 1–201. Instead, unless the parents consent to the adoption of their child, the department is required to petition the circuit court for guardianship pursuant to F.L. § 5–313. If the circuit court finds by clear and convincing evidence, after considering the statutorily enumerated factors, that it is in the best interest of a child previously adjudicated a CINA for parental rights to be terminated, the circuit court has authority to grant the department's petition for guardianship. Such award carries with it the right for the department to consent to the adoption of the child. F.L. § § 5–311 and 5–317(f).

The overriding theme of both the federal and state legislation is that a child should have permanency in his or her life. The valid premise is that it is in a child's best interest to be placed in a permanent home and to spend as little time as possible in foster care. Thus, Title 5 of the Family Law Article seeks to prevent the need for removal of a child from its home, to return a child to its home when possible, and where returning home is not possible, to place the child in another permanent placement that has legal status.

335 Md. at 103–06, 642 A.2d at 203–05.

## 2.
## THE ROLE OF AND REQUIREMENTS
## ON THE TRIAL COURT

■■■ We explained the role of and requirements on trial courts in applying Subtitle 8 of Maryland's Family Law Article in our opinion in *In re: Damon M.,* pointing out that:

Prior to 1998, the responsibility for developing a permanency plan for a child in foster care was entrusted to the local department of social services. Md.Code (1984, 1991 Repl. Vol., 1995 Cum.Supp.) § 5–525(c) of the Family Law Article. Before 1996, a plan developed by the local department was reviewed by the court, together with the report and recommendation of the Foster Care Review Board, as a part of the disposition review hearing the court was required to conduct. Md.Code (1984, 1991 Repl.Vol.) § 5–544(3) of the Family Law Article. As a result of the amendment of the Juvenile Causes Act in 1996, see Ch. 595, Laws of 1996, the juvenile court was mandated to "hold a hearing to review the implementation of a permanency plan" for each child in foster care within 10 months of the disposition hearing in which the CINA finding was made. Md.Code (1996, 1997 Cum.Supp.) § 3–826.1 of the Courts and Judicial Proceedings Article. It is of interest to note that the statute provided that if the child was to be "continued in placement for a specified period," then the court would have to determine "the extent of compliance with the permanency plan." § 3–826.1(d). The subsequent amendment to § 3–826.1, see ch. 539, Laws of 1998, to make it conform with the Federal Adoption and Safe Families Act of 1997 effected a significant change. Now, the court has the responsibility for determining the permanency plan, § 3–826.1(a)(1) and justifying the placement of children in out of home placements for a specified period or on a long-term or permanent basis, § 3–826.1(d), in addition to conducting periodic, six month reviews. § 3–826.1(f).

*In re: Damon M.,* 362 Md. at 430–31 n. 1, 765 A.2d 624 n. 1. We continued, explaining that:

Section 3–826.1, [now codified as § 3–823] [10] requires the court, not later than 11 months after a child found to be in

---

**10.** Effective October 1, 2001, the portion of Title 3 of the Courts and Judicial Proceedings Article containing the statutory provisions governing child in need of assistance proceedings (the "Juvenile Causes Act")

was recodified. Section 3–826.1, recodified as § 3–823, now reads as follows:

§ 3–823. Permanency plan for out-of-home placement

(a) Definition.—In this section, "out-of-home placement" has the meaning stated in § 5–501 of the Family Law Article.

(b)permanency planning hearing.—

(1)The court shall hold a permanency planning hearing:

 (i)No later than 11 months after a child in a CINA proceeding enters an out-of-home placement to determine the permanency plan for the child committed under § 3–819(b) of this subtitle; or

 (ii)Within 30 days after the court finds that reasonable efforts to reunify a child with the child's parent or guardian are not required based on a finding that a circumstance enumerated in § 3–812 of this subtitle has occurred.

(2)For purposes of this section, a child shall be considered to have entered an out-of-home placement 30 days after the child is placed into an out-of-home placement.

(3)If all parties agree, a permanency planning hearing may be held on the same day as the reasonable efforts hearing.

(c)Same—Requests for review.—

(1)On the written request of a party or on its own motion, the court may schedule a hearing at any earlier time to determine a permanency plan or to review the implementation of a permanency plan for any child committed under § 3–819 of this subtitle.

(2)A written request for review shall state the reason for the request and each issue to be raised.

(d) Distribution of permanency plan.—At least 10 days before the permanency planning hearing, the local department shall provide all parties and the court with a copy of the local department's permanency plan for the child.

(e)Determinations to be made at hearing.—At a permanency planning hearing, the court shall:

(1)Determine the child's permanency plan, which may be:

 (i) Reunification with the parent or guardian;

 (ii) Placement with a relative for:

 1. Adoption; or

 2. Custody and guardianship;

 (iii)Adoption by a nonrelative;

 (iv)Guardianship by a nonrelative;

 (v)Continuation in a specified placement on a permanent basis because of the child's special needs or circumstances;

 (vi)Continuation in placement for a specified period because of the child's special needs or circumstances; or

 (vii)Independent living; and

(2)For a child who has attained the age of 16, determine the services needed to assist the child to make the transition from placement to independent living.

(f)Continuation of placement for a specified period.—The court may not order a child to be continued in a placement under subsection (e)(1)(v) or (vi) of this section unless the court finds that the person or agency to which the child is committed has documented a compelling

reason for determining that it would not be in the best interest of the child to:

(1)Return home;

(2)Be referred for termination of parental rights; or

(3)Be placed for adoption or guardianship with a specified and appropriate relative or legal guardian willing to care for the child.

(g)Placement for adoption.—In the case of a child for whom the court determines that the plan should be changed to adoption under subsection (e)(1)(iii) of this section, the court shall:

(1)Order the local department to file a petition for guardianship in accordance with Title 5, Subtitle 3 of the Family Law Article within 30 days or, if the local department does not support the plan, within 60 days; and

(2)Schedule a TPR hearing instead of the next 6–month review hearing.

(h)Periodic reviews.—

(1) (i)Except as provided in subparagraphs (ii) and (iii) of this paragraph, the court shall conduct a hearing to review the permanency plan at least every 6 months until commitment is rescinded.

(ii)The court shall conduct a review hearing every 12 months after the court determines that the child shall be continued in out-of-home placement with a specific caregiver who agrees to care for the child on a permanent basis.

(iii) 1. Unless the court finds good cause, a case shall be terminated after the court grants custody and guardianship of the child to a relative or other individual.

2. If the Court finds good cause not to terminate a case, the court shall conduct a review hearing every 12 months until the case is terminated.

(2)At the review hearing, the court shall:

(i)determine the continuing necessity for and appropriateness of the commitment;

(ii)determine the extent of compliance with the permanency plan;

(iii)determine the extent of progress that has been made toward alleviating or mitigating the causes necessitating commitment;

(iv)Project a reasonable date by which a child in placement may be returned home, placed in a preadoptive home, or placed under a legal guardianship;

(v)Evaluate the safety of the child and take necessary measures to protect the child; and

(vi)Change the permanency plan if a change in the permanency plan would be in the child's best interest.

(3)Every reasonable effort shall be made to effectuate a permanent placement for the child within 24 months after the date of initial placement.

(i)Notice and opportunity to be heard.—

(1)In this subsection, "preadoptive parent" means an individual whom a child placement agency, as defined in § 5–301 of the Family Law Article, approves to adopt a child who has been placed in the individual's home for adoption before the final decree of adoption.

(2)If practicable, the local department shall give at least 7 days' notice before any hearing conducted under this section to the child's

need of assistance has been placed in foster care, see also Md.Code (1989, 1991 Repl.Vol., 1997 Cum.Supp.) § 5–501(m) of the Family Law Article, to hold a permanency planning hearing to determine the permanency plan for that child. § 3–826.1(a)(1) [now § 3–823(b)(1) ]. At that hearing, for each child in placement and in determining the plan, the court is required to make certain decisions and findings, § 3–826.1(c), [now § 3–823(e) ] specifically, whether the child should be: returned to the parent or guardian, § 3–826.1(c)(1)(i) [now § 3–823(e)(1)(i) ]; placed with relatives to whom adoption or guardianship is granted, § 3–826.1(c)(1)(ii) [now § 3–823(e)(1)(ii) ]; placed for adoption, § 3–826.1(c)(1)(iii) [now § 2–823(e)(1)(iii) ]; emancipated, § 3–826.1(c)(1)(iv) [now deleted]; or because of the child's special needs or circumstances, continued in placement on a permanent or long-term basis or for a specified period." § 3–826.1(c)(1)(v) and (vi) [now § 3–823(e)(1)(v) and (vi) ]. There are restrictions on the court's ability to continue a child in placement because of the child's special needs or circumstances. § 3–826.1(d) [now § 3–823(f) ]. That section prohibits the court from using that option

> "unless it finds that the agency to which the child is committed has documented a compelling reason for determining that it would not be in the best interest of the child to:
>
> "(1) Return home;
>
> "(2) Be referred for termination of parental rights; or

---

foster parent, preadoptive parent, or relative providing care for the child.
(3)The foster parent, preadoptive parent, relative, or an attorney for the foster parent, preadoptive parent, or relative shall be given an opportunity to be heard at the hearing.
(4)The foster parent, preadoptive parent, relative, or attorney may not be considered to be a party solely on the basis of the right to notice and opportunity to be heard provided under this subsection.
(j)Written reports.—At a review hearing under this section, the court shall consider any written report of a local out-of-home placement review board required under § 5–545 of the Family Law Article.

"(3) Be placed for adoption or guardianship with a specified and appropriate relative or legal guardian willing to care for the child."

Section 3–826.1 (f) [now § 3–823(h)] mandates periodic reviews of the permanency plan by the court. Subsection (f)(1)(i) [now § 3–823(h)(1)(i) ] provides that such reviews will be "no less frequently than every six months until commitment is rescinded." If, however, at the permanency planning hearing or a subsequent review hearing, the court, inter alia, orders a child continued in permanent foster care, the court is no longer required to hold the review hearings at six month intervals. Subsection (f)(1)(ii) [now § 3–823(h)(1)(ii), now revised to require review hearings every 12 months.]. As is true of the initial permanency planning hearing, the court must make some determinations at the hearing to review the permanency plan. § 3–826.1(f)(2) [now § 3–823(h)(2) ]. Among other things, in addition to determining whether the commitment remains necessary and appropriate, subsection (f)(2)(i) [now § 3–823(h)(2)(i) ], and evaluating the progress made toward alleviating or mitigating the causes of the commitment, subsection (f)(2)(iii) [now § 3–823(h)(2)(iii) ], the court is required to "determine the extent of compliance with the permanency plan," subsection (f)(2)(ii) [now § 3–823(h)(2)(ii) ], and to change it "if a change in the permanency plan would be in the child's best interest." Subsection (f)(2)(v) [now § 3–823(h)(2)(vi) ].

The permanency plan is an integral part of the statutory scheme designed to expedite the movement of Maryland's children from foster care to a permanent living, and hopefully, family arrangement. It provides the goal toward which the parties and the court are committed to work. It sets the tone for the parties and the court and, indeed, may be outcome determinative. Services to be provided by the local social service department and commitments that must be made by the parents and children are determined by the permanency plan. And, because it may not be changed without the court first determining that it is in the child's best interest to do so, the permanency plan must be in the

child's best interest. These are the reasons, no doubt, that the court is charged with determining the plan and with periodically reviewing it, evaluating all the while the extent to which it is being complied with.

It is true, of course, that a parent will have lost custody before a permanency plan will have been developed. Nevertheless, once determined, because the permanency plan sets out the anticipated permanent placement, to the achievement of which the "reasonable efforts," required by § 3–826.1(f)(3) [now § 3–823(h)(3) ], must and will be directed, it can not be totally divorced from the issue and, in point of fact and in a real sense, actually is a part of it. Moreover and in fact, when the plan is reunification, there necessarily is, on the part of the court and, certainly, the parent, an expectation—more than a hope—that the parent will regain custody. That is, after all, the point of the plan and the reasonable efforts, including the provision of services to the family, so necessary to achieving compliance.

*Id.,* 362 Md. at 435–37, 765 A.2d at 627–28. As *In re: Damon M.* observes, the purpose of a permanency plan is to set the direction in which the parent, agencies, and the court will work in terms of reaching a satisfactory conclusion to the situation. Once set initially, the goal of the permanency plan is re-visited periodically at hearings to determine progress and whether, due to historical and contemporary circumstances, that goal should be changed. It is not the purpose of the initial permanency plan hearing, however, to resolve all issues involved in that final resolution. If that were the case, there would be no need for review of how, on a regular basis, the plan is progressing or not. Also as *In re: Damon M.* indicates, the initial permanency plan hearing is to be held and conducted expeditiously. Protracted proceedings in establishing the initial plan defeat the purpose of the statute. The statute presumes that, unless there are compelling circumstances to the contrary, the plan should be to work toward reunification, as it is presumed that it is in the best interest of a child to be returned to his or her natural parent.

## D.

## THE STANDARD OF REVIEW

In *In re: Damon M.* we held that, despite their interlocutory nature, orders of court regarding permanency plans are immediately appealable. *Id.* 362 Md. at 438, 765 A.2d at 628–29. The appellate standard of review as to the overall determination of the hearing court is one of "abuse of discretion." Because children and fundamental rights are at stake, and the fact that speed and stability are desirable where permanency plans are concerned, it is useful to discuss at some length what precisely "abuse of discretion" means in the context of review of a permanency plan order. In *In re Adoption/Guardianship No. 3598*, 347 Md. 295, 701 A.2d 110 (1997), we described "abuse of discretion" as follows:

> Judicial discretion was defined in *Saltzgaver v. Saltzgaver*, 182 Md. 624, 635, 35 A.2d 810, 815 (1944) (quoting Bowers' Judicial Discretion of Trial Courts at P 10) as "that power of decision exercised to the necessary end of awarding justice and based upon reason and law, but for which decision there is no special governing statute or rule." It has also been defined as a "reasoned decision based on the weighing of various alternatives." There is an abuse of discretion "where no reasonable person would take the view adopted by the [trial] court," or when the court acts "without reference to any guiding rules or principles." An abuse of discretion may also be found where the ruling under consideration is "clearly against the logic and effect of facts and inferences before the court," or when the ruling is "volatile of fact and logic."
>
> Questions within the discretion of the trial court are "much better decided by the trial judges than by appellate courts, and the decisions of such judges should only be disturbed where it is apparent that some serious error or abuse of discretion or autocratic action has occurred." In sum, to be reversed "the decision under consideration has to be well removed from any center mark imagined by the reviewing

court and beyond the fringe of what that court deems minimally acceptable."

347 Md. at 312–13, 701 A.2d at 118–19 (some internal citations omitted).

For cases involving the custody of children generally, our precedents establish a three part review of the decisions of the lower courts, addressing the findings of fact, conclusions at law, and the determination of the court as a whole. We set forth the rule for review of custody cases in *Davis v. Davis*, 280 Md. 119, 372 A.2d 231 (1977), where we explained:

Maryland Rule 886 (applicable to this Court) and, in identical language, Rule 1086 (applicable to the Court of Special Appeals) provide the standard of review of actions tried without a jury.[11] In such actions, the appellate courts of this State "review the case upon both the law and the evidence, but the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses." Rule 886 & 1086. The "clearly erroneous" concept is no newcomer to Maryland procedure: The predecessor of Rule 886 (adopted effective January 1, 1957 as Rule 886 a), General Rules of Practice and Procedure, Part Three, III, Rule 9 c (effective September 1, 1944), contained the same scope of review embodied in the present rule; moreover, prior to the standard's codification as a rule, it was the time-honored practice on appeals to this Court in equity actions to give great weight to the chancellor's findings of fact. And we have heretofore noted that these rules in essence merely conformed the scope of review in nonjury actions at law to the scope of review we had always applied in equity appeals. Nothing in Rule 886 indicates that it does not apply to all cases tried without a jury, and we have explicitly held that the rule applies when we review nonjury criminal causes (under Rule 772), nonjury defective delinquency cases, child

---

11. The clearly erroneous standard of Rules 886 and 1086 are now combined in Rule 8–131(c).

support awards, and child custody cases. *Hild v. Hild,* 221 Md. 349, 359, 157 A.2d 442, 448 (1960). Since *Hild* we have consistently applied the "clearly erroneous" portion of Rule 886 (or that standard without citation to the rule) in our review of child custody awards. Moreover, even prior to our explicit recognition in *Hild* of the applicability of Rule 886, our predecessors in essence utilized the clearly erroneous standard when reviewing factual determinations on appeals of child custody actions. Since Rules 886 and 1086 are identical, what we say with respect to one is equally applicable to the other.

Having determined that Rule 886 is controlling in child custody cases, we now consider the extent to which the "clearly erroneous" portion of it applies in such appeals. The words of the rule itself make plain that an appellate court cannot set aside factual findings unless they are clearly erroneous, and this is so even when the chancellor has not seen or heard the witnesses. On the other hand, it is equally obvious that the "clearly erroneous" portion of Rule 886 does not apply to a trial court's determinations of legal questions or conclusions of law based upon findings of fact.

Although these two propositions are clear, there is some confusion in our cases with respect to the standard of review applicable to the chancellor's ultimate conclusion as to which party should be awarded custody. Notwithstanding some language in our opinions that this conclusion cannot be set aside unless clearly erroneous, we believe that, because such a conclusion technically is not a matter of fact, the clearly erroneous standard has no applicability. However, we also repudiate the suggestion contained in some of our predecessors' opinions, and relied upon by the Court of Special Appeals in *Sullivan v. Auslaender,* 12 Md.App. 1, 3–5, 276 A.2d 698, 700–01 (1971), and its progeny, that appellate courts must exercise their "own sound judgment" in determining whether the conclusion of the chancellor was the best one. Quite to the contrary, it is within the sound discretion of the chancellor to award custody according to

the exigencies of each case, and as our decisions indicate, a reviewing court may interfere with such a determination only on a clear showing of abuse of that discretion. Such broad discretion is vested in the chancellor because only he sees the witnesses and the parties, hears the testimony, and has the opportunity to speak with the child; he is in a far better position than is an appellate court, which has only a cold record before it, to weigh the evidence and determine what disposition will best promote the welfare of the minor.

**In sum, we point out three distinct aspects of review in child custody disputes. When the appellate court scrutinizes factual findings, the clearly erroneous standard of Rules 886 and 1086 applies. [Secondly,] [i]f it appears that the chancellor erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the chancellor founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the chancellor's decision should be disturbed only if there has been a clear abuse of discretion.**

280 Md. at 122–26, 372 A.2d at 232–34 (some internal citations omitted; emphasis added). See also *Robinson v. Robinson,* 328 Md. 507, 513, 615 A.2d 1190, 1193 (1992); *McCready v. McCready,* 323 Md. 476, 484, 593 A.2d 1128, 1131 (1991); *Lipiano v. Lipiano,* 89 Md.App. 571, 576, 598 A.2d 854, 857 (1991), *cert. denied,* 325 Md. 620, 602 A.2d 710 (1992).

In CINA cases where there has been found a past instance of abuse or neglect, the Legislature dictates that specific supporting facts be determined by the hearing court. Md. Code (1974, 2002 Repl.Vol.); Cts. & Jud. Proc. Article, § 3–801 defines a "child in need of assistance (CINA) as "a child who requires court intervention because: (1) the child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and (2) the child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs." As noted *supra,* Md.Code (1974, 2002 Repl.Vol.), Cts. & Jud. Proc. Article,

§ 3–823(f) requires that the trial court not order long term foster care unless the court finds "that the person or agency to which the child is committed has documented a *compelling reason* for determining that it would not be in the best interest of the child to: (1) return home; (2) be referred for termination of parental rights; or (3) be placed for adoption or guardianship with a specified and appropriate relative or legal guardian willing to take care for the child" (emphasis added). As we have pointed out, *supra*, § 3–823(f) sets forth a statutory hierarchy of placement options in descending order of priority. First and foremost, the court must consider returning the child to the child's parent or parents. *In re Adoption/Guardianship Nos. J9610436 and J9711031*, 368 Md. at 677–78, 796 A.2d at 784–85; *In re: Adoption/Guardianship No. 10941*, 335 Md. at 105–06, 642 A.2d at 204–05.

Where the child has been declared a "child in need of assistance" because of abuse or neglect, the trial court is further constrained by the requirements of § 9–101.[12] This section directs the court to deny custody to the parent unless the court makes a specific finding that there is no likelihood of further abuse or neglect.[13] Md.Code (1974, 1999 Repl.Vol.), Family Law Art., § 9–101(b); *see also In re Mark M.*, 365 Md. at 706, 782 A.2d at 343. The burden is on the parent previously having been found to have abused or neglected his or her child to adduce evidence and persuade the court to make the requisite finding under § 9–101(b). *See In Re: Adoption No. 12612*, 353 Md. 209, 232–39, 725 A.2d 1037, 1048–52 (1999). The language of § 9–101(b) notwithstanding, it does not require that the hearing judge be a prophet or soothsayer and somehow "know" that there will never be a

---

**12.** For the full text of § 9–101, see *supra* n. 8.

**13.** "The Legislature and the Supreme Court have both expressed their view that children should not be uprooted from their family but for the most urgent reasons. We add to that admonition the further suggestion that the reasons should be clearly explicated by the trial judge who assumes that awesome responsibility and that his findings of fact should expressly support his conclusions." *In re Jertrude O.*, 56 Md.App. 83, 99, 466 A.2d 885, 894 (1983).

future incident of abuse or neglect. Such a finding would require unobtainable proof on the part of the parent, and omniscience on the part of the judge. Such a construction would render the statute nonsense.[14] As we pointed out in *In re: Adoption No. 12612*, 353 Md. 209, 238, 725 A.2d 1037, 1051(1999):

> Section 9–101 focuses the court's attention and gives clear direction in the exercise of its discretion. It does not set an insurmountable burden; even upon substantial evidence of past abuse or neglect, it does not require a finding that future abuse or neglect is impossible or will, in fact never occur, but only that there is no likelihood—no probability— of its recurrence. Webster defines likelihood as probability, something that is *likely* to happen. (emphases added).

"The fear of harm to the child or to society must be a real one predicated upon hard evidence, it may not be simply gut reaction or even a decision to err-if-at-all on the side of caution." *In re Jertrude O.*, 56 Md.App. at 100, 466 A.2d at 894.

## A.

As we noted *supra*, the first step in our review of the case *sub judice* is to scrutinize the factual findings of the juvenile court under the clearly erroneous standard. We reiterate that one of the findings required here is a finding by a preponderance of the evidence that there is no likelihood abuse or neglect is likely to reoccur.[15] The juvenile judge's

---

14. This Court stated in *D & Y, Inc. v. Winston*, 320 Md. 534, 538, 578 A.2d 1177, 1179 (1990), that "construction of a statute which is unreasonable, illogical, unjust, or inconsistent with common sense should be avoided." (Citations omitted.) *See also Blandon v. State*, 304 Md. 316, 319, 498 A.2d 1195, 1196 (1985) ("[R]ules of statutory construction require us to avoid construing a statute in a way which would lead to absurd results."); *Erwin and Shafer, Inc. v. Pabst Brewing Co.*, 304 Md. 302, 311, 498 A.2d 1188, 1192 (1985) ("A court must shun a construction of a statute which will lead to absurd consequences.")

15. *See Shurupoff*, 372 Md. at 657, n. 3, 814 A.2d at 554, n. 3.

findings, presented from the bench in support of her 28 March 2001 order, were as follows:

At long last, the evidence is all over, and I'm going to do what I promised Yve I would do. And it's not an easy thing to do. It hasn't been easy. This case has not been easy from the very beginning, because of the parties involved in it. And I don't mean the attorneys and the foster parents and the social workers. I don't mean that at all. I mean, because of Yve and her mom.

I think that I remarked the last time, and I will reiterate again that I think that I've had this case almost 100 percent of the time the hearings have come in. I believe that I even had the emergency, I had the adjudication, I had the disposition, uh—**I'm the judge who returned Yve to her mom, uh—and obviously hindsight's 20/20, but that was a major disaster.**

I've been the judge that's seen Yve and watched her progress since she came back from North Carolina. I've seen Yve on many occasions. She's come in to see me. We usually don't have her sitting here. Sometimes we do, for the court hearings, if they weren't too controversial, we had her here. **She's drawn me many pictures. She's written me many letters. We've had many conversations at foster care picnics. She's one of the first children that always comes up to me and says hi, Judge [ ], how are you, and tells me what's going on with her, and intro-duces me to all her friends. She's a lovely, delightful little girl.**

But, during all the years that I've known Yve, I know that she's not what she appears on the surface. She also has many, many problems. **Her mom is a wonderful person, and for the most times that she's been in the courtroom, she's been very, very appropriate, very polite, respectful, uh, trying to answer questions that were given to her, trying to give information and has never, ever shown anything but complete love and concern for Yve.**

And I think that [Counsel for Yve S.] is right, that Yve has always wanted to be with her mom. There's no ques-

tion about it, and her mom has always wanted Yve with her. The problem has been that for a good portion of this case, Mom's not been capable of taking care of Yve. **And for also a good portion of the case, even if Mom were capable, at certain times, Yve's had some real severe problems.** I remember when she first went to live with [Yve S.'s first foster family]. She had some real acting-out problems. As a matter of fact, before she even came into care, the school were so concerned, her problems were such, she was acting out in school. They were very, very concerned about her, with what was going on, which is, I think what eventually brought the Department into the case, was the school's concern, because they saw her on an everyday basis, and her inability to conform her behavior, uh—brought her to the attention of, uh, the authorities.

There's no doubt in my mind that Ms. S. absolutely adores Yve, and there's no doubt in my mind that Yve adores her mom. But, I cannot at this time return Yve to her mom. Although she's doing much better than at any time that I've ever seen her, just a few things stand out that are indicative of decisions that she made that put Yve at risk.

**One of the reasons that she lost her job, and who knows what the real reason is, but we've had a lot of people testify about it.** Ms. S. testified about it, Ms. Rose [the social services case worker] testified about it, the minister testified about it, uh—is that week she chose to go to Suburban Hospital rather, with a friend that was having a problem, rather than go to work. Now, I certainly admire her for doing that.

**She is a good friend and wants to help the person, but that was one of the straws that broke the camel's back, about why she lost her job.**

On Sunday, I think that it's wonderful that she works with women at the homeless center, because she herself was there for a while. She understands how important that it is to be involved there. **But, she doesn't need to bring that**

woman around Yve. Yve's a child who needs constant care, attention, structure, as well as love.

Uh—I'm very aware of Yve's condition when she came back from North Carolina and all of the things that happened to her in North Carolina. Uh—that situation was very detrimental to her. She ended up being placed, by her mom, left in the care of some people who were pretty bad people. Hopefully nothing happened to her. We don't know for sure whether it did or it didn't, but she ended up having to go into foster care there, and then coming back here.

**As recently within the last two weeks, she says she wanted to kill herself. That's definitely a child with special needs.** Most ten-year-olds do not go around saying they want to kill themselves. **She says that she wants to be with her mom, because her mom needs her. She wants to make her mom happy. That's a very big burden for a ten-year-old girl.** It's really hard for her to take care of herself, much less feel the responsibility of having to take care of her mom.

**I don't know, there's no way to ever know whether Ms. S. will be able to take care of Yve.** I hope so, but it is certainly not now. And Yve asked me to make a decision, and I'm not going to have that decision be that we'll work towards getting her home with her mom, because I don't see the realistic expectation of that. I honestly don't.

**Taking care of her on weekends, and I'm so glad that the visits have been successful, is one thing, but trying to manage a child like Yve, with all of the, the special attention that she needs, and all the coordination that is involved with**

getting her to the therapist that she needs, working with the school system. **Mom's tried, she really has tried, and I give her all kinds of credit for that. I think that she's done a wonderful job with that. But no one today says that she's able to do it, and I don't know when she'll ever be able to do it.**

The job situation is certainly part of it, but that's not the whole thing. It's a judgment consideration. I understand what Ms. Rose talked about her concern about the escalation in behavior, and I also understand that Dr. Harold [Yvonne S's psychiatrist] sees that not as a problem. He talked about the lack of communication. I was struck not by the same things that Ms. Rose was struck by, with Ms. S.'s testimony, but her—inability sometimes to listen to what the question is, and answer it. She often answers questions that are asked. And Dr. Harold alluded that with—Ms. Rose testified that she tried to say to Ms. S., I can't read his writing, I don't understand what he means, you've got to tell me what the explanation was, and it became a big problem.

Somehow or another, that lack of communication, and I don't really know why, but it happens a lot. **And today, when Ms. S. was testifying, she often answered questions that were not the questions that were asked. The information was certainly beneficial and appropriate, but it was not the question that was asked.**

**My point in bringing that up is that Yve is a child who requires constant, vigilant attention, and she needs clear guidelines, structure. She needs to know, she has to act within something that she can anticipate. And the progress that she's made in the [current foster parent's] home, from the testimony has been, because of the structure that they've been able to provide for her.**

**I have extreme concerns about the mom ever being able to provide the structure that Yve needs.** So, I know that it's taken me a long time to get here, but it's taken us a long time, and we've heard a lot of evidence. And, I don't think that any of it wasn't beneficial. I was very interested to hear from, us—Ms. S.'s minister, and I'm so happy for her that she has him in her life, and that she has the extended church. I think that information was very, very beneficial, and I'm glad for her that she has that. And it's a real network that can help her.

I think that it's wonderful that she has Dr. Harold. Clearly, they have an excellent relationship, and she's made so much progress from where she's ever since the 50—how many months, four, six, since we've been involved in this case, uh, she's made wonderful progress, and she's doing really, really well. But I just cannot make the decision that she's going to be able to take care of Yve.

So, I am going to adopt the permanency plan of long-term foster care. I feel that it's appropriate that she remain, where she has been, for over thirty-some months, where she has done very well. She's blossomed there. On the other hand, I think that it's very appropriate that she continue to have visitation with her mom, and as frequent— certainly a minimum of once a week, and as long as both of them are able to maintain safety.

Again, my priority is Yve. She is number one. It's my understanding from listening to Ms. Rose testify that she's hoping to get back to weekend visits, very, very soon, and I would certainly hope that's what happens. But, I am going to put the visitation minimum of once a week, under the direction of the Department, because clearly, in this case, things change. Things change with Yve, and things change with her mom.

(emphases added). It is apparent to us from these "findings" that the best interest of the child standard was misapplied in this case. As detailed *supra*, the proper issue before the hearing judge was whether there was sufficient evidence that further abuse or neglect was unlikely.[16] Except to the extent that the parent's ability, or lack thereof, to deal with the needs of a child rise to the level of neglect, findings that the child has "some real severe problems" or "has special needs" or "requires constant, vigilant attention," or has mentioned sui-

---

16. We note that the form orders employed in this case, such as the 28 March 2001 and the 20 December 2001 orders, left one line blank for the reasons justifying removal. In both instances, typed on the line provided was "welfare and/or safety of the respondent."

cide,[17] are not relevant to this determination. Similarly, as we have pointed out repeatedly, the fact that the child may be "doing very well," or may have made progress in the environment of foster care, or even "blossomed there," or may feel that she needs to take on the burden of caring for the parent, are also largely not telling on the main issue. "The fact that [a parent] has a mental or emotional problem and is less than a perfect parent or that the children may be happier with their foster parents is not a legitimate reason to remove them from a natural parent competent to care for them in favor of a stranger." *In re: Barry E.*, 107 Md.App. at 220, 667 A.2d at 938.

Reading the remaining "findings" in a light most charitable to the hearing judge, we note that she seemed to be concerned about the mother's ability to exercise sound judgment, doubt about which the trial judge felt somehow placed Yve S. at risk. The hearing judge neither states how these concerns rose to the level of, or somehow indicate a future likelihood of, abuse or neglect, nor is it particularly clear how any of the judge's concerns, individually or collectively, actually put Yve S. at any perceivable risk. More to the point, however, the "findings" themselves are not supported by the relevant record evidence.

The first of these findings is the assumption by the trial judge that one of the reasons Yvonne S. lost her job was because she chose to visit a sick friend in the hospital instead of going to work on time. Yvonne S did testify that she went to the hospital one day as the result of a friend passing away, and that as a result she was slightly over two hours late for work that day. The undisputed testimony, however, was that she nonetheless worked over eight hours that day. There is no testimony in the record by anyone that her being late for work that day was the reason for the loss of the particular job.

---

17. This Court is unable to find any mention in the record of Yve S. discussing suicide prior to the hearing judge's 28 March 2001 ruling. A remote mention of such a conversation, however, does occur after the initial ruling. We are puzzled, therefore, as to how such a finding could be made when it was.

To the contrary, the uncontraverted testimony from Yvonne S. and from her psychiatrist, Dr. Harold, was that the reason she lost her job was because of the scheduling demands made upon Ms. S. by the case worker, Ms. Rose, and by the numerous court hearings in this case. Regarding Ms. S.'s employment discharge, Ms. Rose testified on cross-examination:

Petitioner's Counsel: How many phone contacts did she have with the employer prior to his informing her that she was going to be fired?

Respondent's Counsel: And I would object as to relevancy.

COURT: I'll allow it.

A: Since Ms. S. first began working there?

Q: Yes

A: This will just be off the top of my head, because I— would have to go back through my notes. I would say probably about six.

Q: And, uh, most of those occurred prior to her being fired, didn't they?

A: All but one occurred prior to her being fired.

Q: But within the month prior to her being fired?

A: No.

Q: Was there one prior to the one where he told you she was fired?

A: One—

Q: Tell—

A: All of them but one were prior to the—her being fired. Which one are you—

Q: Okay. In the month before she was fired, how many times did you talk to her employer?

A: Uh—I don't recall talking to him at all that previous month.

Q: Do you remember talking to Ms. S about having a visit with Yve that would go over into a Monday?

A: Yes, thank you for refreshing my memory. There was one.

Q: And what did you say to the employer?

A: I, uh—we were trying to offer Ms. S. extended visits. She had mentioned at her school meeting that she didn't have as much information as the rest of us, 'cause she felt that she didn't have that much time with her daughter.' And I was trying to come up with some plan where we could extend that. So I offered her a visit beginning from Friday evening until she could keep her through Monday morning.

Q: And she told you that she couldn't do that, because she had to be at work early on Monday morning?

A: She had to be at work at nine o'clock Monday morning, yes.

Q: And in order to do that, she would have to drive Yve to Silver Spring in the morning, and they would have to get up too early in the morning. It wouldn't be good for Yve.

A: That was her statement.

Q: And she also told you that this was jeopardizing her job, if she continued to make requests of her employer?

A: I don't remember her saying that it was jeopardizing her job. My memory is that she said that her employer did not want her to do this, because she might come in late.

Q: Was it after that, that you talked to the employer?

A: Yes

Q: And what did you say to him?

A: I asked him if this was a concern that he had?

Q: And that was before the conversation that you had with him, where he told you that she was fired?

A: Yes

There is nothing in Ms. Rose's testimony that supports the "finding" of the trial judge that poor judgment was the reason for Yvonne S.'s discharge, and certainly nothing connecting the discharge to a visit to a friend in the hospital.

Similarly, there is no such connection in any of the testimony by others who addressed the issue of Yvonne S.'s employment. Yvonne S. testified as follows:

Q: Did Christopher Trump (Phonetic)—

A: Uh—

Q: Tell you that you were discharged?

A: Uh—well, I had, after that, I had a meeting with two staff people. One was human resources, two were human resources, one was Chris Trump, and he said to me, you've been canceled, which I don't really know what canceled means. And then I spoke to the director, who—I mean, he's the director of the activities department, who I've had excellent performance with, who had written several letters of recommendation and excellent job performance, which is under, the Court does have. The situation is this. Your Honor, uh, he is, unfortunately, the Department of Health and Human Services has placed a lot of uh—pressure on my schedule, uh, and he has been so accommodating with my scheduling and you know, court dates, letters that he's written in my, on behalf of my support, which I appreciate immensely.

And, uh—because of that, he's very, very concerned that uh, because of that, I'm not going to be there for the residents . . .

 * * * * * *

Q: Did Chris Trump tell you yesterday, that you were being discharged from the job because you were being tardy so often and absent so often?

A: What he said was, I said that I was rarely ever late, that I would come in early much of the time to compensate for any of the work that I missed, up—uh, for, for court hearings or what have you. And that is absolutely true. Rarely have I ever been late. I would, I would go early, and not get paid for it, and that comment was made by the Human Resources, well, you're not allowed to do that. And I said, well I, I just, you know, wanted to compensate for the time, you know, that I have missed concerning court orders.

Chris Trump and I discussed at length about uh, the Department and—making demands on my time, and he accommodated one hundred percent, and he just, I made a comment about the possible appeal, if I didn't get this

situation with Yve back. And said, oh no, you mean—I said it might not be now, or three months from now. He said, oh no, you mean I'm going to have to look forward to going through this again with you through the court system and with the Department of Health and Human Services? And then right after that, the word canceling you came out.

Dr. Harold, Yvonne S.'s psychiatrist, also testified as to how the demands made by the Department were creating stress regarding Yvonne S.'s employment:

Q: And have you noted that she's under some stress no, or not under stress now?

A: Uh, the current stress is around, you know, this court hearing, regarding custody. And so uh—that obviously has been of some stress to her. Uh, there has been some stress recently around just the requirements that she's had to keep, uh, regarding caring for her daughter, and uh, complying with the County and Court stipulations for uh—you know, regarding custody.

Q: Could you explain to [the Judge] in a little detail what some of the stresses are you are dealing with, that she's had to face, and what—what she's expressed to you, and how you've helped her deal with that?

A: A lot of it has been around, around scheduling, uh, as has been brought out. Uh, there has been some impact on her job, because of, uh, scheduled activities regarding, uh—school, or meeting with Ms. Rose, or uh—uh, scheduled things with her daughter and her therapist, and, her daughter's doctor. Schedules, in terms of family visits uh, with the Scheibels, and that weekend exchange. So, the impact on her work schedule, and that, that has been stressful. (E–265–66)

The only other individual who testified on this score was Yvonne S.'s pastor, Reverend Robinson. He testified as follows:

Q: Reverend, do you have any connection with this administrator at her prior employment? Is she involved in your church, or were you just working with her, for—

A: She's a parishioner of our church.

Q: She's a parishioner? And what is her name?

A: Leah Bowden.

Q: How do you spell that last name?

A: B-o-w-d-e-n.

Q: And is it your understanding that Ms. S. has lost her job at the Potomac Nursing Home and is looking for a new job?

A: I don't know if I have the liberty to—

Petitioner's Counsel: Objection, Your Honor, I—

A: really answer that.

COURT: Well, I'll allow him, her to inquire on the basis of his conversation with this lady, because he testified to that, as to being sure that she would be able to get her a job. So, I'll allow him to answer that.

A: Okay, uh, to my understanding that she lost the job, definitely from that department that she was in. That the administrator has indicated uh, there may be a possibility in another department. I know that she's also their link to several other homes in the area, with uh, some kind of working agreement, partnership, I don't know exactly, but uh—

Q: And is it your understanding that she lost the job because she was unreliable and undependable—

Petitioner's Counsel: Objection.

Q: in coming to work?

Petitioner's Counsel: Objection.

COURT: Overruled

A: Uh—no, I was not told that. I'm not fully acquainted with exact—all the reasons why she lost the job.

Based upon this record, the pertinent finding of the trial judge is clearly erroneous. There is simply no competent evidence in the record to support the "finding" that choosing to visit a friend in the hospital was given meaningful weight in the prior employer's decision to let go Yvonne S. As such, it cannot support a "finding" as an example of poor decision-

making "that put Yve at risk." On the contrary, the record indicates, if anything, that the loss of her former position was a consequence of dealing with the hearing court's and the Department's requirements and proceedings.

■ Similarly, we are at a loss to understand how Yvonne S.'s religious conviction and her volunteering to work at a homeless shelter were transformed into a detriment to Ms. S.'s ability to give appropriate attention to her child (at the time of the 28 March 2001 hearing an eleven year old girl) or how it placed her child at risk. Giving a homeless woman a ride to church is not evidence of a deficiency in judgment, and certainly is not evidence of potential future abuse or neglect on the part of the mother.

■ The third "finding" of the hearing judge explicated how she viewed, in essence, Ms. S.'s testimonial demeanor. Apparently the trial court shared the view reflected in the testimony of the social worker, Ms. Rose, that because Ms. S. gave more information than was requested in response to questions posed to her when testifying indicated that Ms. S. potentially was relapsing into a manic phase of her mental illness. We shall address Ms. Rose's testimony *infra.* The only other testimony as to Ms. S.'s testimonial demeanor came from the only participant qualified and in a position to draw a medical conclusion from such observation, Ms. S.'s treating psychiatrist, Dr. Harold. At the 28 March 2001 hearing, Dr. Harold testified as follows regarding Ms. S.'s earlier testimony:

Q: And, uh, were you able to observe her testimony?

A: Yes.

Q: And, uh, what did you observe about her demeanor and her, uh, uh—her language, during that testimony, specifically?

A: Really nothing out of the ordinary, from what I observed with her, having met with her over our time of, uh—my treating her.

Q: And that would be over two years?

A: Yes.

Q: And, uh—the social worker expressed concern, specifically about her jumping from subject to subject. What did you observe about that?

A: I haven't seen that in my meetings with her, nor during that hearing.

Q: What did you observe about her, uh—her answers to questions during that hearing.

A: They were directed. I guess the problem came when Ms. S. made her statements involving religion and her views of how that would figure into the court outcome.[18]

Q: What was your take on that?

A: Uh—it wasn't anything, I think excessive, in terms of, uh—concern about hyperreligiosity, as related to say, a manic episode. I didn't see that evident there.

Q: What, what's your, uh, thought on the fact that she raised, uh, religion at all?

A: It, it—you know, once again, it really wasn't excessive to the degree that it would, you know, warrant concern about this being indicative of a manic episode. And actually, in fact, uh, having taught Sunday school myself for about

---

**18.** In her 15 February 2001 testimony, which apparently everyone involved assumed would be Ms. S.'s last opportunity to address the court, she stated that:

I want Yve back, Judge [ ], and she wants to be with me. I love my daughter, and I really, really believe that I can provide a loving, nurturing, safe home. And yes, I have used poor judgement in the past, and I did disappoint you, in North Carolina, but I do have better support systems now. I just wish I could restore your faith in me. I'm trying so hard, Judge [ ], and I'm honestly going to say this, that I believe, and I've told the attorney this over and over again, that you've been appointed by God to make the right decision, and the word says that I need to pray for you, and I always do, and Yve has complete faith in you, and so do I. And it's not our will be done, but God and the Lord's and the Judge. And that's the way that it is, because I can't see into her future, as the author and finisher of her faith of her life. And he's deemed you to make the right decision, and I believe in you. I'm just asking for you to believe in me, and give me a chance to be her mother again.

These statements, under the circumstances, were neither excessive nor inappropriate.

six years, uh,—I've seen very similar kind of statements, uh—or not so much statements, but level of expression of faith. It wasn't anything unusual, I thought.

Also, in terms of working with people who have bipolar illness, who do become excessive with their religious thoughts and statements, it wasn't anything near that, that degree.

Q: What are the—what kinds of behaviors would give you concern?

A: If the majority of her statements, say during the entire hearing and also during meetings with myself, uh—if those were present, that to me would indicate some excessive religious thoughts.

Q: And, uh—what about her demeanor during the hearing? Did you have any concern about that?

A: Uh—you know, it, this has been a long hearing. I mean, we have been at this since December, looking for a decision. And you know, to me, it seems like everybody's kind of dealing with the stress of when a decision would be made. And, you know, at the time, that was looking to be, the time something would be decided, you know, was like, this is her, her last ditch effort in a sense. This is her putting in her plea, her emotions, her, you know, her view of how she would like this to come out.

Q: Was there anything at all during that testimony that raised any concern on you part?

A: No

Q: What about expressing sadness and crying?

A: Uh—in light of what's just at stake here, it seemed appropriate.

Q: What would you see in someone that was going into a manic episode that would be different from that?

A: It's much more, much more excessive. It's much more frequent, uh, it's much more elevated, in terms of the degree of the expression, and it's also, you know, coupled with other behaviors indicative of a manic-type episode.

We agree with Petitioner that she is not a professional witness and, as such, fairly can be expected not to give precise, clipped answers to questions, especially given the stakes involved. We also agree with Petitioner that "equating her demeanor on the witness stand to a lack of structure indicative of an inability to attend to a child who 'needs vigilant attention' is a strained inferential leap at best . . .," in light of the testimony of the psychiatrist, and particularly where the hearing judge herself quixotically states in her findings that the additional information supplied by Yvonne S. was both "beneficial and appropriate." This is hardly compelling evidence of a likelihood of future abuse or neglect. The hearing judge's finding is clearly erroneous.

▪ Finally, the trial court found that Ms. S. was unable to care for a child with the needs of Yve S. because "no one today says that she's able to do it. . . ." That finding also it is unsupported on this record. Dr. Harold testified on direct examination as follows:

Q: Do you, based on your work with Ms. S. for the last two years, is it your professional opinion that she can provide a stable, consistent and supportive family environment for Yve?

A: I would say that her case record or track record with us, and if she continued to do this well, she's able to do that.

Q: Is there any contraindication to having custody of your children where you have bipolar illness?

A: It depends on one's stability. Certainly, if someone is actively uh, in a manic episode, or depressed episode, uh, and if that, depending on the severity of that, that certainly can affect one's ability to rear children. With Ms. S., uh, and honestly, we have tried to be as objective about this as we can, we being myself, [and my psychiatric practice colleagues] Dr. Sommers and Ms. Kazinski, in looking at her uh, treatments, her uh, wellness and her ability to do this. And we all conclude that uh, with her compliance, uh—and her lack of symptoms at this point, she's able to do that. And, we certainly would not recommend otherwise, if we

thought so. And we've—done that with others in the past who we thought couldn't, you know, met obligations.

More germane, however, was Dr. Harold's testimony on the level of stress full custody would have on Yvonne S., and the likelihood of relapse as a result of that stress:

Q: What about the effect of working with the social worker in this case?

A: That's been stressful, because there's been a lot of demands placed on Ms. S., in regards to, uh, what she has to provide for the social worker, in terms of documentation, uh, visits, uh—just compliance with what's ordered by the Court.

Q: What kind of demands have been made that you think are somewhat stress-producing for her?

A: Uh, Ms. S., has talked about problems with her visits, particularly weekend visits, that were unannounced and unexpected, uh—that's been stressful. She's talked about just having to basically prove herself, how she's gotten some feedback from the social worker about uh, uh—uh, what uh, she considers uh, I guess her duty, or her objective, uh, in working with Ms. S—

Q: Whose duty?

A: Ms. S.

Q: The social worker, or Ms. S.?

A: Uh, Ms.—the social worker's

Q: What uh—what about the reporting requirements? What does the social worker ask Ms. S. to do that is somewhat stressful? Was there something specifically that she's asked her to do after every visit?

A: She's talked about how she has to write a report, chronicling what happens with each visit, what took place.

Q: What about meetings with therapists and other people? Are there report requirements for that as well?

A: Uh—I believe so. I'm not totally sure.

Respondent's Counsel: I would object, Your Honor, as to relevancy. This witness is testifying about what may be uh,

appropriate for a child welfare agency to do. I don't know how it's relevant.

Petitioner's Counsel: Well, I'm asking him about stressors on Ms. S., and whether it's really worthwhile for this to continue.

COURT: Well. I don't think that that's what this case is about, stressors on Ms. S.[19] Why don't we go onto another question.

Petitioner's Counsel: Well, I think that it is. I think that the Department is saying that she's going to be more stressed if she gets the child in her custody, and I'm saying that she will be less stressed.

COURT: Well, I don't think that you've said that. Why don't you ask that question then.

Q: Would she be more stressed or less stressed, if she's placed, uh, if the child is placed in her custody? Would that be more stressful or less stressful for Ms. S.?

A: At this point, I would have to say uh, less stressful, and like I said before, I think that the best way to uh, to uh, determine that would be to increase the visitation time and see how well she handles that.

Q: Why would it be less stressful?

A: Uh, this is what she wants. It's what she feels able to do, uh—she would have proven she's a capable parent. Uh, the situation of custody and her uh, parenting competency will have been resolved.

Q: When you say that she wouldn't have to report to anyone, you're talking about the written reports that she has to write at the end of every visit?

A: Yes.

Q: Have you met with the social worker and talked to her about the stresses, the requirements that she makes of Mrs. S.?

---

**19.** In fact, stressors on Ms. S. are relevant to the stability of her illness and the likelihood of a relapse, which in turn is directly related to the issue of the likelihood of future neglect.

A: I've met with the social worker once. The subject of these things came up, although I did not talk with her directly about that.

Q: Did you have an opportunity to observe her demeanor, and uh—and manner with Ms. S.?

A: Yes.

Q: And what conclusions did you come to, if any, about how she treats her?

A: Uh—

Respondent's Counsel: Again, Your Honor, I would object. I mean, he's indicated that he's had one meeting with the social worker. I just don't think that this witness is, is an expert, I mean, in that, I man—

COURT: I'll let him testify.

Respondent's Counsel: He was called as an expert, as a psychiatrist for the, for the mother.

COURT: I don't consider this to be an expert opinion. I'll allow him to answer it, if he has an opinion. He might not have one.

A: Uh—I think that Ms. Rose uh, is certainly acting as an advocate for Yve. I think where we, uh, disagreed was what Ms. S. had to do in order to prove her competency, in being Yve's full-time parent. I think that Ms. Rose is concerned about Ms. S., uh, having some relapses as far as her illness goes, and how that would affect Yve. And uh, my response to her was that certainly I can't give you a guarantee. I think Ms. Rose is looking for a time factor, of how long Ms. S. could remain stable, and I said, you know, myself or nobody can do that. However, uh, the indicators that we have at this time are that for two years, she's been stable. And for situations like that, with this illness, that's a good prognostic indicator of her likely to do well. I'm not sure it that was satisfactory for her, uh—probably the fact that we're still here means that it wasn't.[20]

_____

20. We have some concern, from this record, whether the Department's requirements of Petitioner were part of the problem, rather than the

solution. Because we are not finding facts, it is not necessary to detail every instance where evidence of this conduct is brought to light, but the following excerpt from Dr. Harold's testimony, at a hearing subsequent to a reduction in visitation ordered by Ms. Rose, is revealing.

Q: Have you talked to Ms. Rose about her concerns about Ms. S.?

A: Yes.

Q: What have you told her?

A: That I hear her, in terms of her being concerned about Ms. S.'s, uh—lack of cooperation with her, her irritable mood around her. I said I haven't seen it with my meeting with her. From my interpretation of what's going on, it's their relationship that has been a problem. From my talk with Ms. S., with Ms. Rose, and looking at just the conditions around this whole hearing, this whole situation, Ms. S. as been aware for several months the County's opinion that she should not have full custody of her daughter. That, on top of successive, uh—cut backs on visitation, problems that she's had with trying to meet some of the demands that the County's put on Ms. S., what I'm seeing, that has been Ms. S's sources of antagonism.

She has to work with somebody on a weekly basis who really doesn't feel that she can do that job. And Ms. Rose has not hidden that fact from me, that that's how the County sees it, that she's not able to become a full-time mom. And they've acknowledged that, that's their opinion. Uh, and I've tried to report that to Ms. S., that this is what you're dealing with.

In spite of that, you've still got to work with the lady. You still have to work with the County. You still have to prove that you can do it.

I've tried to express to Ms. Rose, Ms. S.'s side of the argument in terms of, her I'm asked to do all the things in terms of compliance, get a job, find housing, be responsible, make my visits, etcetera, etcetera, and in spite of each of those conditions being met, I still get penalized.

We also are mindful of the imbalance of resources sometimes inherent in such cases. As the Court of Special Appeals pointed out in *In re Jertrude O.*:

The State's ability to assemble its case almost inevitably dwarfs the parent's ability to mount a defense. No predetermined limits restrict the sums an agency may spend in prosecuting a given ... proceeding. The State's attorney usually will be expert on the issues contested and the procedures employed at the fact finding hearing, and enjoys full access to all public records concerning the family. The State may call on experts in family relations, psychology, and medicine to bolster its case. Furthermore, the primary witnesses at the hearing will be the agency's own professional caseworkers whom the State has empowered both to investigate the family situation and to testify against the parents. Indeed, because the child is already in agency custody, the State even has the power to shape the historical events that form the basis for termination.

56 Md.App. at 95, 466 A.2d at 891–92, quoting *Santosky v. Kramer*, 455 U.S. 745, 762–63, 102 S.Ct. 1388, 1399, 71 L.Ed.2d 599 (1982). Perhaps examples of how historical events can be shaped by social services exist in the case *sub judice* involving the circumstances surrounding Ms.

Dr. Harold reiterated on cross-examination his earlier testimony that Ms. S. was capable of being a full-time mother:

Q: You indicated in response to a question, and I'm quoting, I think that I'm quoting you directly that if the mother remains on the medication and remains in treatment, there's a good chance of being an adequate parent. Is that an adequate parent to any child, or to Yve?

A: Any child.

The finding that reunification would be improper because there was no testimony that the mother was capable of being a parent is clearly erroneous.

## B.

 Petitioner contends that the substance of Ms. Rose's testimony, and specifically her opinion testimony derived from and relying on her observations of Ms. S.'s demeanor while testifying, were not proper subjects of opinion testimony by her. Petitioner claims that such testimony invaded the province of the fact-finder and was therefore tantamount to one witness testifying as to the veracity of another witness's testimony. Petitioner further asserts that Ms. Rose was not qualified to offer any such opinions and that her observations "were speculative, led to no 'reasonably accurate conclusions,' and thus they had no 'probative force.' " We agree in part, but only as to Ms. Rose's effort to offer a psychiatric diagnosis or prognosis. It was entirely proper, however, for Ms. Rose to testify as to factual observations within her personal knowledge and to offer relevant opinions within the sphere of her admitted expertise discussed *infra.*

---

S.'s employment and visitation conflicts. Another might be the following exchange between Petitioner's counsel and the social worker, Ms. Rose, which occurred at the 29 April 2002 hearing reviewing the permanency plan:

Q: And for the last year, [Ms. S.] has completely complied with your service agreement with her, hasn't she?

A: No, because she disagrees with the plan.

Q: Other than disagreeing with the plan, she is completely cooperative in doing what she needs to do?

A: Yes.

We begin our analysis with a cautionary reminder of how trial courts should weigh the testimony of the typical kinds of experts appearing in cases of this type.

> Evidence offered by social workers, psychologists and psychiatrists may be necessary in custody cases. The equity court, however, is entitled to weigh that evidence along with contradictory testimony and its own observations. Reliance upon "the auxiliary services of psychiatrists, psychologists, and trained social workers ... should not be too obsequious or routine or the experts too casual." Such reliance could lead the courts, in acts of misapplied psychology, to separate unjustly family members.

*Sanders,* 38 Md.App. at 423, 381 A.2d at 1164–65 (internal citations omitted). In the case *sub judice,* Ms. Rose, the social worker assigned to this case by the Department, was qualified and testified, in relevant part, as follows:

> Respondent's Counsel: Your Honor, at this point, I would offer Ms. Rose as an expert in child welfare and in the uh, uh, I would say assessment and evaluation of children and their families.
>
> Petitioner's Counsel: I would object, Your Honor. I don't think that we've established, certainly we haven't established assessment and evaluation of children and their families. We don't have anything that would approach that. Expert in child welfare, I'm not sure what that means, Your Honor. It seems very broad, so I would object to that as well.
>
> COURT: [Counsel for Yve S.]?
>
> Counsel for Yve S.: I would agree that we haven't established that she's an expert in evaluation of anybody. But I certainly would, would go with the expert in child welfare.
>
> COURT: Child welfare is certainly a very broad field. You want to limit that somewhat as to—
>
> Respondent's Counsel: I guess, let me try this again. I'll offer her as an expert social worker, in uh, child welfare and working with abused and neglected children in foster care uh—settings.

COURT: [Petitioner's Counsel]?

Petitioner's Counsel: I'll agree that she's an expert in social work, in a limited area.

COURT: Well, I think that I probably know Ms. Rose, through all of her career, and in her different roles, and I certainly will recognize her as an expert in dealing with foster children and foster homes and their needs, the needs of the children.

Respondent's Counsel: Thank you

COURT: So I'll recognize her as that.

Respondent's Counsel: Ms. Rose, in your work as a social worker, and specialized, do you have to assess the, the risk of children in both their foster homes and in uh, visiting situation with their parents?

A: Yes.

Q: And, can you tell the Court what was it about [Ms. S.'s] testimony yesterday that caused you to have concerns about continuing these expanded, overnight visits?

A: It was the change that I had observed in uh, her demeanor, and in her uh, ability to—

Petitioner's Counsel: Objection.

COURT: Overruled.

A: Ability to answer the questions that were put to her.

Q: And what was it about the mother's demeanor that you saw yesterday that was different than what you had seen more recently?

A: She appeared to me to be a little more agitated—

Q: You've got to keep your voice up so that I can hear you.

A: Okay, she appeared to be a little more agitated, uh, than I had seen her in previous weeks, although I have sensed some of this, over the past few weeks. But it was more pronounced yesterday. I was concerned that she would answer the question and get off target frequently. The other concern I had was that uh, she did bring some of her religious beliefs into her testimony, which was concerning.

Q: And why was that concerning?

A: When I first met Ms. S. in 'ninety-eight, uh, she presented, uh, talking very quickly, uh, not being able to stay on the subject matter, and also speaking frequently on religious issues. I was concerned at that time, and, but not knowing her, did not know what, whether this was her, uh,—demeanor for the most part. But, as I worked over the next, through December and January, I got increasingly concerned because of her telephone calls and her telephone messages that she would leave for me to the point that I had to inquire, to contact her therapist in North Carolina and report my concerns that I felt that uh, she was becoming more agitated and was hoping that they would be able to see her, address the issues that I felt that I was hearing over the phone.

Q: Just so I can clarify that, that was back in 'ninety-eight?

A: That was the end of 'ninety-eight and January of 'ninety-nine, and unfortunately, Ms. S., had to be hospitalized in February of 'ninety-nine.

Q: And how do you compare Ms. S.'s testimony yesterday with what you were seeing in 'ninety-eight?

A: Much milder form, not nearly as uh—progressive as I saw it, at that point, but different than what I saw a month ago.

Q: In terms of the subject matter that the mother testified to yesterday, in terms of what she did with Yve on, on the last weekend that she had her, did you have any concerns about that testimony?

A: I, She had sent me a note that said that they attended church and went on a tour, uh, at the Bethesda Naval Hospital, I believe it was. And, which you know, sounded reasonable on the paper. But, in her testimony, she indicated that she had gone to Bethesda Naval Hospital, prior to going to church. She lives in Gaithersburg, of course the hospital's in Bethesda, and the church is in Rockville, and she was, she said that church began at ten o'clock. I—am

concerned, because it seemed like that might be something that would be a little out of the ordinary to do, to make that choice to go tour, or walk around the grounds of Bethesda Naval Hospital prior to church. It seemed different from what, the way that she presented doing things in the past.[21]

Q: And when you say different, how does that different impact on her—mental status?

A: I don't know how it impacts on her mental status. I just—

Petitioner's Counsel: Objection—

A: It's a concern.

Petitioner's Counsel: Move to strike.

COURT: The answer was, it's a concern. I'll allow that.

Q: When you saw, first saw the mother in nineteen ninety-eight, was she in a manic phase?

A: I did not know that she was in a manic phase, because I just met her. I did not know how she appeared. I was concerned, because she, as I mentioned, she appeared to be very agitated, she spoke very rapidly, she changed subjects frequently. And she had a lot of uh—religious talk. I am not in a position to diagnose whether she was in a manic phase or not, but that was the way that she appeared to me.

Q: And your understanding was that she was hospitalized shortly after that?

A: Within two months of my first meeting of her.

In *Beahm v. Shortall,* 279 Md. 321, 368 A.2d 1005 (1977), we pointed out that:

> the determination of whether a witness is qualified as an expert witness is generally within the discretion of the trial court, and will not be overturned unless the discretion has been manifestly abused to the prejudice of the complaining

---

21. Ms. S. testified that they visited the hospital because her father had studied there as a medic and she wanted Yve S. to see something relevant to her heritage. Why this visit seemed relevant to the social worker, or indicative of anything of concern to her, is a bit of a mystery to us.

party. In *Stickell v. City of Baltimore,* 252 Md. 464, 471, 250 A.2d 541 (1969), we observed: "It is well established that a person must demonstrate a minimal amount of competence or 'expertise' on the subject on which he is allegedly an expert in order to be qualified to testify as an expert witness."

279 Md. at 338–39, 368 A.2d at 1015 (some internal citations omitted). As this language suggests, the mere fact that a witness has been accepted to testify as an expert in a given field is not a license to testify at will. Such a witness only will be allowed to testify as an expert in areas where he or she has been qualified and accepted. Where a witness who is qualified as an expert in one area strays beyond the bounds of those qualifications into areas reserved for other types of expertise, issues may arise as to the proper admissibility of that testimony. As the Court of Special Appeals noted in *Globe Security Systems Co. v. Sterling,* 79 Md.App. 303, 556 A.2d 731 (1989):

> The Court ruled [in *Simmons v. State,* 313 Md. 33, 41–42, 542 A.2d 1258, 1262–63(1988) ] that an expert may be permitted to address an ultimate issue upon which the jury must reach a conclusion. *See also* Md.Cts. & Jud.Proc.Code Ann. §§ 9–120 (1984) (a psychologist licensed in Maryland and qualified as an expert may testify on ultimate issues). The expert's opinion, however, is admissible only if it is based upon a legally sufficient factual foundation. "The facts upon which an expert bases his opinion must permit reasonably accurate conclusions as distinguished from mere conjecture or guess."

79 Md.App. at 307–08, 556 A.2d at 733–34 (some internal citations omitted). *See also Bohnert v. State,* 312 Md. 266, 274–76, 539 A.2d 657, 661–62 (1988).

The penultimate question in this case was whether the mother's mental illness had stabilized to the point where she could take care of her daughter properly. No court or expert is in possession of a magical crystal ball capable of answering with certainty this question, as the psychiatrist, Dr. Harold, pointed out, *supra.* The standard, rather, is whether it is not

likely that neglect will be repeated, which in this case ultimately becomes a question of whether the mother was stable and seemed likely to remain so.

 Prior to 1978, only a licensed psychiatrist was permitted to make a diagnosis as to whether an individual was suffering from, or suffering a relapse of, a mental illness because the making of such a diagnosis constituted the practice of medicine. *State v. Williams*, 278 Md. 180, 184, 187, 361 A.2d 122, 125–26 (1976); *State v. Tull*, 240 Md. 49, 55–57, 212 A.2d 729, 732–33 (1965); *Spann v. Bees*, 23 Md.App. 313, 320–22, 327 A.2d 801, 805–06 (1974) *Saul v. State*, 6 Md.App. 540, 549–50, 252 A.2d 282, 286–87 (1969). Md.Code (1974, 2000 Repl.Vol.), Health Occupations Art., § 14–301 states: "Except as otherwise provided in this title or § 13–516 of the Education Article, an individual shall be licensed by the Board before the individual may practice medicine in this State." Md.Code (1974, 2000 Repl.Vol.), Health Occupations Art., § 14–101(k)(1), in relevant part, defines the practice of medicine as engaging, "with or without compensation, in medical: (i) Diagnosis." Md.Code (1974, 2000 Repl.Vol.), Health Occupations Art., § 14–101(k)(2) states, in relevant part, that the " 'practice of medicine' includes doing, undertaking, professing to do, and attempting any of the following: (i) Diagnosing, healing, treating, preventing, prescribing form or removing any physical, mental, or emotional ailment or supposed ailment of an individual." With the passage of Chapter 481 of the Acts of 1978, now codified at Md.Code (1974, 2002 Repl. Vol.), Cts. & Jud. Proc. Art., § 9–120, psychologists were allowed to give a mental diagnosis.[22] *State v. Bricker*, 321 Md.

---

**22.** Md.Code (1974, 2002 Repl.Vol.), Cts. & Jud. Proc. Art., § 9–120 states:

> Notwithstanding any other provision of law, a psychologist licensed under the "Maryland Psychologists Act" and qualified as an expert witness may testify on ultimate issues, including insanity, competency to stand trial, and matters within the scope of that psychologist's special knowledge, in any case in any court or in any administrative hearing.

As to the Maryland Psychologist's Act, see Md.Code (1974, 2000 Repl. Vol.), Health Occupations Art., §§ 18–101 to 18–502.

86, 95–98, 581 A.2d 9, 13–15 (1990); *State v. Conn,* 286 Md. 406, 413–15, 408 A.2d 700, 703–04 (1979). Subsequently, in *In Re: Adoption/Guardianship No. CCJ14746,* 360 Md. 634, 759 A.2d 755 (2000), we held that the Legislature, in Md.Code (1974) Health Occupations Art., § 19–101(m)(4)(ii) specifically allowed licensed clinical social workers to make a mental diagnosis, and therefore, they could testify to the same. 360 Md. at 641–47, 759 A.2d at 759–62. There have been no additional changes, and the rule remains the same at present. A witness may not testify to the effect of making a diagnosis concerning mental illness unless he or she is a physician qualified to make such a diagnosis or prognosis, or unless they are otherwise authorized by statute to make such diagnosis.

The Department's apparent theory in the case *sub judice* was that Ms. S., a woman diagnosed with a bi-polar disorder, was not a fit parent because, during a critical court appearance, where the future of her family was at stake, she evidenced nervousness and agitation, which, according to the social worker, Ms. Rose, was indicative of a relapse into another manic episode, notwithstanding the testimony of Yvonne S.'s treating psychiatrist to the contrary. Ms. Rose, however, went one step too far, a step well beyond the scope of her expertise. Apparently trying to have it both ways, she stated: "I am not in a position to diagnose whether she was in a manic phase or not, but that was the way that she appeared to me." Ms. Rose also testified that "[U]nfortunately, Ms. S.'s history is such that it's very questionable as to whether or not she's going to be able to maintain her stability" and also that "Ms. S. has done an amazing job in the last two years of being able to stabilize herself. But, it, it's such that I, it appears to me that it takes a lot of her energy to keep herself stable. To add to the pressure of caring for a very special needs child such as Yve, the placement's [with the mother] not going to last." These statements are not only speculative, but amount to a lay diagnosis or prognosis regarding a complex medical issue. Ms. Rose is not qualified to do that, as she was not qualified as a psychiatrist, psychologist, or licensed clinical social worker. The testimony was improper and should have

been stricken. The trial judge erred in overruling Petitioner's objections to this testimony.

Nevertheless, this does not constitute a *per se* ground for reversal. The burden is upon Petitioner to show that the erroneously admitted testimony was material and prejudicial. In *Beahm*, we pointed out that:

> In the interest of the orderly administration of justice, and to avoid useless expense to the state and to litigants in its courts, it has long been settled policy of this court not to reverse for harmless error." This policy was iterated in *Balto. Transit Co. v. Castranda*, 194 Md. 421, 439, 71 A.2d 442 (1950) and reiterated in *Adams v. Benson*, 208 Md. 261, 269, 117 A.2d 881 (1955). As a corollary of that policy, it is firmly established that the complaining party has the burden of showing prejudice as well as error. If prejudice is shown, this Court will reverse. We summed up the policy with respect to the erroneous admission of hearsay evidence in *Kapiloff v. Locke*, 276 Md. 466, 472, 348 A.2d 697 (1975):
>
>> "It is, of course, true that the erroneous admission of evidence will not justify reversal unless the complaining party can show that the admission was prejudicial to him.... However, it is also clear that this Court will not hesitate to reverse where hearsay evidence is erroneously admitted and prejudice is shown.... The burden of proving prejudice in a *civil* case is on the complaining party ...." (citations omitted).

Precise standards for the degree of prejudice required for reversal, have not been, and perhaps cannot be, established. In *Rippon v. Mercantile–Safe Dep.[ & Trust Co. of Baltimore]*, supra, 213 Md. at [215] 222, 131 A.2d 695 [(1957)], we noted that the complaining party made no effort to show "unfairness or harm." In *Hance v. State Roads Comm.*, 221 Md. 164, 176, 156 A.2d 644 (1959) we observed: "Courts are reluctant to set aside verdicts for errors in the admission or exclusion of evidence unless they cause substantial injustice," so "substantial prejudice" must be shown. In *Rotwein v. Bogart*, 227 Md. 434, 437, 177 A.2d 258 (1962) we

declared that "this Court will not reverse for an error below unless the error 'was both manifestly wrong and substantially injurious' ", quoting 2 *Poe on Pleading and Practice* (Tiffany's ed.) §§ 287, p. 249. In *State Roads Comm. v. Kuenne,* supra, 240 Md. at 235 [213 A.2d 567], we spoke in terms of the error having "a prejudicial effect on the outcome of the case." In *I.W. Berman Prop. v. Porter Bros.,* 276 Md. 1, 11–12, 344 A.2d 65 (1975), we repeated the "both manifestly wrong and substantially injurious" language of *Rotwein v. Bogart,* supra, and added: "An error which does not affect the outcome of the case is 'harmless error'." In *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976), we enunciated the rule of harmless error applicable to criminal trials. We traced the history of the effect of an erroneous admission or rejection of evidence. *Id.,* at 646–647 [350 A.2d 665]. We concluded:

> "In modern times, appellate review in all jurisdictions is subject to tenets that a judgment may be affirmed, under certain circumstances, despite errors committed in the conduct of the trial. Such rules in their application represent appellate judgments that a retrial is not justified if the error has not affected the rights of the parties. These rubrics, of constitutional, statutory or judicial origin, employ a variety of standards for determining whether a particular error is 'harmless,' but all require 'the resolution of whether the error significantly affected the interests of the complaining party'." *Id.,* at 647 [368 A.2d 1005] citing C. McCormick, *Evidence,* §§ 183 at 429–430.

The short of it is that what constitutes prejudice warranting reversal in the erroneous admission or rejection of evidence is to be determined on the circumstances of each case. 279 Md. at 330–32, 368 A.2d at 1011–12 (some internal citations omitted). In *Maryland Deposit Insurance Fund Corp. v. Billman,* 321 Md. 3, 580 A.2d 1044 (1990), we refined the standard for when reversal was warranted, holding that:

> In determining whether improperly admitted evidence, or extraneous matter considered by a jury, prejudicially affected the outcome of a civil case, the appellate court balances

" 'the probability of prejudice from the face of the extraneous matter in relation to the circumstances of the particular case....' " It is not the possibility, but the probability, of prejudice which is the object of the appellate inquiry.

321 Md. at 17, 580 A.2d at 1051 (internal citations omitted).

We are unable to conclude here that the improperly admitted evidence was harmless. The only competent medical testimony properly admitted into the record regarding Ms. S.'s present mental state and future prognosis was that of Dr. Harold, her treating psychiatrist. The juvenile judge apparently discounted his testimony and appeared to draw conclusions identical to those improperly admitted as a part of Ms. Rose's testimony. Reversal would be warranted on this ground alone.

## C.

As we stated, *supra*, we conclude that the hearing court misapplied the best interest of the child standard in this case. As we pointed out, the standard does not mean that the child should be placed in the best possible environment. The statutory mandate requires that reunification of the child with the parent be the goal of the permanency plan if there is competent and credible evidence that future abuse or neglect is not likely. "The fear of harm to the child or to society must be a real one predicated upon hard evidence; it may not be simply a gut reaction or even a decision to err-if-at-all on the side of caution." *In re Jertrude O.*, 56 Md.App. at 100, 466 A.2d at 894. A fair reading of the findings and ruling of the hearing court indicate that the focus of the court was on what would be the best environment for Yve S., not whether future neglect or abuse was not likely if returned to her mother's custody. The trial judge commented on the allegedly superior stability and structure of the foster home, and whether Yvonne S. would be able to provide the level of structure the court felt Yve S. needed. Reinforcing this notion, the court ruled that Yve S. should remain in long-term foster care, stating "I feel that it's appropriate that she remain, where she

has been, for over thirty-some months, where she has done very well. She's blossomed there." Because the hearing judge focused on where Yve S. would be better off, as opposed to the competent evidence of future abuse or neglect, insufficient consideration was given to whether the goal of the permanency plan should be reunification rather than long-term or permanent foster care.

## D.

 Regarding the juvenile judge's ultimate conclusion, we particularly find telling the statement by the trial judge that "I'm the judge who returned Yve to her mom [in 1998], uh—and obviously hindsight's 20/20, but that was a major disaster." A natural reluctance to risk the possibility of a repeat "disaster" is a pervasive theme throughout the record of this case, reflecting a philosophy "to err-if-at-all on the side of caution" on the part of the Department, as represented by Ms. Rose, and the juvenile judge. The overriding theme was "What if Ms. S. suffers a relapse of her illness?" The legitimate question, however, should have been: What is the likelihood of a relapse by Yvonne S. sufficiently severe that Yve S. likely would suffer abuse or neglect? The only properly admissible testimony on this issue came from the treating psychiatrist, who stated that as Ms. S. had been stable for over two years and her prognosis was good.

The future is never certain for every child and for every family in these cases. The presence of a mental illness is not in and of itself a compelling reason for not pursuing reunification of a family unit, any more than would be the discovery that a parent had a terminal illness or was on the brink of financial ruin. An illustration of this concept, presented by Petitioner's counsel at oral argument, observed that the State would not be allowed to take a child away from a diabetic, who has managed successfully his or her ailment through self-administered insulin, on the mere fear that he or she might stop taking the insulin and fall into a diabetic coma at any time.

The evidence before the hearing judge regarding a reunification goal for the permanency plan was substantial. Ms. S. had remained stable and on her medications for over the last two years prior to the court's 28 March 2001 hearing and order. Her treating psychiatrist testified that her prognosis was good, and that she was capable of taking care of "any child." She had secured housing and the financial means to support herself and Yve S. She completed successfully all of the requirements demanded by the Department. The juvenile judge noted that all of the allowed visitations had gone well, and that Ms. S. was "a wonderful person, and for the most times that she's been in the courtroom, she's been very, very appropriate, very polite, respectful, uh, trying to answer questions that were given to her, trying to give information and has never, ever shown anything but complete love and concern for Yve." While Yvonne S. bore the burden of demonstrating no likelihood of future abuse or neglect, there is nothing in the record to suggest a likelihood of future abuse or neglect, nor is there any such finding by the trial judge.

As was noted *supra,* on 20 December 2001, the hearing judge affirmed her permanency plan order at the conclusion of what appears to be a review hearing. The hearing judge did so despite testimony that the manic episode forecast eight months earlier by Ms. Rose had failed to materialize, that Yvonne S. was gainfully employed and making a higher income than she had been in February 2001, and that all of the allowed visitation between Yvonne S. and Yve S. had gone well.[23] Thus, in addition to reversing the 28 March 2001

---

**23.** The Department, in the person of Ms. Rose, continued to refuse to return visitation to its prior frequency and duration. The Department's perspective regarding visitation is reflected in the following colloquy between Ms. Rose and Petitioner's Counsel, which occurred during the 20 December 2001 review hearing:

Q: And is there a possibility that the Department might consider going back to the full weekend visits that the mother was having with Yve last year?

A: With the plan being, the permanent plan being long-term foster care, the Department would probably not recommend every weekend. Yve needs to understand that the Court's decision was for her to be

order, we shall reverse similarly the 20 December 2001 order as an abuse of discretion on the part of the hearing judge, for the same reasons explained *supra* for reversing the 28 March 2001 order.

## VI.

Petitioner raises the issue of whether the hearing judge's impartiality reasonably might be in question, given the record of the case. Petitioner cites as her primary evidence a statement made by the hearing judge to Yve S. during a recorded interview with the child in chambers. The statement of the hearing judge occurred during her 29 April 2002 interview with Yve S. as a part of the review of the permanency plan:

THE COURT:.... But one thing I think you need to understand is that when we had that long hearing that stretched out for a long time, that is called a permanency planning hearing—

Yve S.: Uh-huh

THE COURT:—we took a lot of evidence and we heard a lot of things and I took a lot of things under consideration and I decided after all of that, and also the whole history—

Yve S.: Yeah

THE COURT:—that it was better for you to stay with [the foster parents].

Yve S.: I know.

THE COURT: **And so it's not something I am going to change my mind about.**

Yve S.: I know.

---

raised by the [foster family]. At this point it appears that it might be too confusing for her if she's spending every weekend with her mother. It's something that has to be assessed as we go along. Q: But aside from giving Yve the wrong impression, the Department wouldn't have any concerns about Yve's safety with her mother at this point? A: At this point, I don't have any concerns about her safety.

THE COURT: You know? So I want you to understand that, I don't want you to think every time we have a review and every time we come to court that there is a possibility that you are going to live with your mom.

Yve S.: I know that.

THE COURT: You know that? Good. Because I don't want you to get upset and think things are going to happen real fast or anything like that because see, I got to think about you long term, because you are how old now?

Yve S.: Now, I am 11 turning 12 in September.

THE COURT: I can't believe that. So I have a long time until you turn 18 and there are a lot of things that can happen between now and then. (Emphasis added).

Petitioner argues that this exchange indicates that the hearing judge already had decided the outcome of the review hearing before receiving Petitioner's evidence.

We shall not decide directly this issue. Because we reverse the juvenile court's orders for the reasons explained in this opinion, the only remaining relief Yvonne S. seeks is prospective recusal of the hearing judge for any proceedings held on remand. Because, as we discovered in the course of our deliberations, the hearing judge has retired and is not eligible to sit in the Circuit Court after 31 December 2002, she may not sit in any hearings held in Yve S.'s case on remand. Accordingly, we need not consider the merits of Petitioner's recusal argument.

## VII.

The parties are in some disagreement as to the meaning and impact of the trial court's ruling and order at the conclusion of the 16 July 2002 review hearing. Respondent apparently is of the opinion that the order was merely a reaffirmation of the 28 March 2001 order, also reaffirmed by the court's order of 20 December 2001. Petitioner argues that there was a substantial change worked in the permanency plan by the 16 July 2002 order, namely, a change from "long-term" foster care to "permanent" foster care.

We understand why the parties disagree. It is not clear to us whether the juvenile judge intended by her 16 July 2002 order a substantive change in the goal of the permanency plan. In her oral ruling rendered at the conclusion of the 16 July 2002 hearing, the judge, in pertinent part, stated:

> If I determine she cannot safely go home, then I must determine from a list of plans in ranking which one is appropriate for her. I made that decision about a year [and] half ago when I had the original permanency planning hearing, and certainly nothing has changed to indicate that I would make any other decision than what I made then as far as what the appropriate place for her is because she cannot safely go home.
>
> *So I will reaffirm the plan of permanent foster care* . . . . (Emphasis added) [24]

After explaining her reasoning, the judge summarized her ruling by stating:

> So basically, for all those reasons I am going to *reaffirm the permanency plan of long-term foster care* in a specific— with a specific caregiver. The law requires that I set another review in a year, which I will do, a review of permanency plan. (Emphasis added).

Apparently, later on 16 July 2002, the judge signed a written "Order For Commitment of Juvenile" intended to memorialize her oral ruling. [25] In that short document was included the following operative paragraph:

> **ORDERED,** This 16th of [July] 2002, by the Circuit Court for Montgomery County, Maryland, Sitting as a Juvenile Court, that the Respondent Child, **Yve S.** is committed to the Montgomery County Department of Health

---

24. As no prior permanency plan ordered by the court reflected "permanent" foster care, the parties were left, as are we, to wonder what was being reaffirmed.

25. A notation at the bottom of this order indicates that the "next review hearing will be April 10, 2003 at 8:30 a.m."

and Human Services for *continued permanent foster care placement* .... (Emphasis added)

It is not entirely clear whether the statutory framework relevant to this case makes a clear distinction of substance between permanent versus long-term foster care. Section 3–823(e)(1) of the Courts and Judicial Proceedings Article provides, in relevant part:

> *Determinations to be made at hearing.*—At a permanency planning hearing, the court shall:
>
> (1) Determine the child's permanency plan, which may be:
>
> * * * * * *
>
> (v) Continuation in a specified placement on a permanent basis because of the child's special needs or circumstances;
>
> (vi) Continuation in placement for a specified period because of the child's special needs or circumstances;

Whether "long-term" is synonymous with "a specified period" as described in (vi) makes (or breaks) the question of whether it is different in substance from "permanent" foster care within the meaning of sub-section (v). No help is to be found on this point in the general definitional section of the CINA statute (§ 3–801).

Further muddying the water regarding this question is the fact that the judge, in her 16 July 2002 order, established for the first time a 12 month cycle of permanency plan reviews. Previous hearings had been held at roughly 6 month intervals. The significance, if any, of this distinction to this issue depends on Md.Code (1974, 2002 Repl.Vol.) Cts. & Jud. Proc. Art., § 3–823(h)(1), which reads, in relevant part:

> (i) Except as provided in subparagraphs (ii) and (iii) of this paragraph, the court shall conduct a hearing to review the permanency plan at least every 6 months until commitment is rescinded.
>
> (ii) The court shall conduct a review hearing every 12 months after the court determines that the child shall be

continued in out-of-home placement with a specific caregiver who agrees to care for the child on a permanent basis

There is nothing we could find, nor was anything relevant brought to our attention by the parties, that better illuminates the proposition that permanent foster care differs substantively from long-term foster care.

Because we are reversing the court's prior orders, upon which the 16 July 2002 order appears at least somewhat dependent, the juvenile court's possibly intended distinction between "permanent" and "long term," if one exists, may be explained and clarified by it in its next review proceeding, if that point retains any relevance. Accordingly, the 16 July 2002 order is reversed as well. The court may give a fresh consideration to the entire situation, including Yvonne S.'s current mental health as it bears on a proper plan for Yve S.

**ORDERS IN # 24 AND # 50 REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY, SITTING AS THE JUVENILE COURT, FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; MONTGOMERY COUNTY TO PAY THE COSTS.**